NORTHWESTERN STATE BANK OF HAY SPRINGS, NEB., et al. v.
SILBERMAN et al.

(Circuit Court of Appeals, Eighth Circuit. July 5, 1907.)

No. 2,552.

**1. SALES—PASSING TITLE—EXECUTORY CONTRACT.**

A corporation contracted to sell to S. 6,600 fleeces, about 55,000 pounds of wool, which it agreed to deliver to the buyer on or about the 12th to 15th day of June, 1905, for 18 cents a pound, acknowledging payment of $2,000 on account; the wool to be from native sheep in merchantable order, well tied, and honestly packed. At the time the contract was made, the wool was on sheep belonging to the corporation; the latter being required to sever the fleeces and put the wool in condition for delivery. *Held*, that the contract was executory, and that title did not pass until delivery of the wool and payment or tender of the price.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Sales, § 542.]

**2. SAME—PAYMENT OF PRICE—MODE OF TENDER—PAYMENT IN CASH—WAIVER.**

At the time an executory contract for the sale of wool was made, the buyer's agent paid $2,000 earnest money by a check drawn by the agent on his principals, which was accepted by the seller. After the wool had been delivered, the buyer's agent asked for information as to how the seller desired the balance of the price paid, offering a draft on the buyers or the buyer's bank draft on Omaha, and the seller replied, "that's all right, either one is good"; but, after the wool was loaded on the cars and the amount computed, the seller demanded the currency, whereupon the buyer's agent wired for the money, agreeing that the wool should not be removed until the money was received and paid two days thereafter. In the meantime, the seller sold the wool to another, and, on the buyer's receipt of the money the day succeeding this sale, it was tendered to the seller as soon as he could be found. *Held*, that the seller had waived payment of the price in cash, and that title to the wool passed on delivery.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Sales, § 551.]

**3. REPLEVIN—PARTIES.**

The physical possession of the wool being in the railroad company, and the buyer's agent having directed the railroad company's agent not to give up the wool, replevin was properly brought by a bank, to which the second sale was made, against the railroad company, and the original buyer's agent.

**APPEARANCE—REMOVAL OF CAUSES—APPLICATION.**

An application by a defendant not served to remove a cause from the state to a federal court is not an appearance to the merits.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 3, Appearance, § 23.]

**5. JUDGMENT—PARTIES—PRINCIPAL AND AGENT—RES JUDICATA.**

Where, after certain wool in controversy had been sold and delivered to the buyer's agent and by him loaded on the cars of a railroad company, the seller resold the wool to a bank, and the latter brought replevin against the agent and the railroad company, to which the buyer was not a party, the judgment in such replevin suit was not res judicata against the buyer's right to recover against the bank for conversion of the wool.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 30, Judgment, §§ 1218, 1191, 1220.]

**6. TROVER AND CONVERSION—PROPERTY REPLEVIED.**

Where certain wool growers, having sold and delivered a quantity of wool, resold it to a bank, which brought replevin against the original buyer's agent and the railroad company in possession, and, after delivery of the wool by the sheriff to the bank, it shipped and sold the wool to a purchaser, who so appropriated and changed it as to destroy its identity, the original buyer was not bound to intervene in the replevin suit, but was entitled to maintain conversion against the bank.

In Error to the Circuit Court of the United States for the District of Nebraska.

This is an action for conversion, growing out of the following state of facts: The Peters & Williams Company, a corporation of the state of Nebraska, was engaged in conducting a sheep ranch near Hay Springs in said state. The defendant in error Silberman Bros. was a copartnership firm residing and doing business at Chicago, Ill., as wool merchants. One David T. Taylor, residing at Hay Springs, was acting as agent for Silberman Bros. in buying and shipping wool to them. On the 13th of April, 1905, Taylor as such agent made a contract with said Peters & Williams Company for the purchase of the 1905 wool clip of the sheep on their ranch, evidenced by the following written memorandum:

"Hay Springs, Neb., April 13, 1905.

"This is to certify that we have sold to Silberman Bros. 6,600 fleeces, about 50,000 pounds of wool, which we agree to deliver to said Silberman Bros., at Hay Springs, on or about the 12th to 15th day of June, 1905; the consideration being 18 cents per pound, we hereby acknowledge having received the sum of two thousand dollars as part payment thereon, on wool warrant, said wool to be from native sheep in merchantable order and condition, well tied and honestly packed, and will defend the title to said wool against all and every person whatsoever.

"[Signed]                                    Peters & Williams Co.,
                                                   "By H. A. Peters."

The two thousand dollars mentioned in the memorandum was paid at the time by check drawn by Taylor on Silberman Bros. The wool in sacks was brought by H. A. Peters, the representative member of said Peters & Williams Company, to the station of the Chicago & Northwestern Railway Company at Hay Springs on the 14th day of June, 1905. The weighing of the wool was begun on that day, and as weighed was branded by Taylor with the letter "P" on one end, and a "diamond S" on the other. The "P" indicated from whom the wool was purchased; and the "diamond S" was Silberman Bros.' brand. When the weighing was complete the sacks were loaded into the cars of said railway company at said station, which cars, the evidence discloses, were ordered by Taylor for the purpose of shipping the wool.

For some reason not satisfactorily explained, on the evening of the 14th of June said Peters went to Chadron, Neb., some 20 miles or more distant, and on the next morning telephoned therefrom to Taylor not to load the wool until he returned. Missing his train at Chadron, he hired a team and drove to Hay Springs, arriving perhaps between 11 and 12 o'clock, and at once called on Taylor at his bank. While there is a conflict in the testimony of Taylor and Peters as to the conversation then had between them respecting the manner of paying for the wool, the testimony on behalf of the defendant in error tended to show that Peters said to Taylor: "It is a little late now, I guess we won't load any wool until after dinner." Taylor replied: "All right. Now, Herman (meaning Peters), for the balance of this money for this wool, I will either give you a draft on Silberman Bros. or our bank draft on Omaha." Peters replied: "That's all right, either one is good." Thereupon they resumed loading the wool into the car about 1 o'clock and finished between 5 and 6 p. m. Taylor closed the car, when the parties returned to Taylor's bank and computed the weights and ascertained the amount due on the wool. amounting to $7,298.02. Thereat Taylor inquired of Peters whether he would have the sight draft on Silberman Bros. or his (Taylor's) bank draft on Omaha. Peters answered that he wanted the currency. Taylor replied, in substance, that if he (Peters), when they first talked over the matter, had said he wanted the currency, he would have had it there to-morrow morning; that he would wire for the money, which would arrive at Hay Springs Saturday morning, the 17th; that he would let the wool stand on the track until the money came. Peters claimed in his testimony that Taylor said he would have the money there Friday morning, the 16th. Taylor then went to the railroad agent and directed him to seal up the cars and not to issue bills of lading to

any one. He wired at once, both to Silberman Bros. at Chicago, and to Omaha, for the money. Seven thousand dollars arrived Saturday morning, the 17th, from Omaha; and $7,000 also came from Chicago on the morning of the 18th. Peters went to Taylor's bank on the 16th and asked if the money had come. Taylor's testimony is that he told Peters on the day previous that the currency could not get there before the morning of the 17th, and that Peters answered that he knew the draft or check was good, but he wanted to beat those Jews, Silberman Bros., and offered to pay Taylor the amount of his commission on the purchase of the wool, amounting to about $250.

The evidence shows that at the time the delivery of the wool was due its market value had gone up five or six cents per pound over the contract price. Peters left, and on the 16th day of June made sale of the wool to the plaintiff in error the Northwestern State Bank, which brought an action of replevin in the state court against said Taylor, the Chicago & Northwestern Railway Company, and Silberman Bros., for the recovery of the wool. Silberman Bros. being nonresidents of the state and not found there, no service of the summons was made on them, and they did not appear to the merits of the action.

After delivery of the wool by the sheriff on the delivery bond to the bank, it shipped and sold it to a purchaser, who so appropriated and changed it as to destroy its identity. Thereafter Silberman Bros. brought this suit against the bank and others for conversion of the wool, and on trial to a jury obtained verdict against the bank for the sum of $11,779.40. To reverse the judgment rendered thereon the bank prosecutes this writ of error.

H. C. Brome (A. H. Burnett and A. G. Fisher, on the brief), for plaintiffs in error.

Irving F. Baxter (James H. Van Dusen, on the brief), for defendants in error.

Before SANBORN and HOOK, Circuit Judges, and PHILIPS, District Judge.

PHILIPS, District Judge, after stating the facts as above, delivered the opinion of the court.

It is to be conceded that the contract of April 13, 1905, was executory in its character. While it recites that Peters & Williams Company have sold to Silberman Bros. so many fleeces, or about 50,-000 pounds of wool, the contract further disclosed that several things were thereafter to be done on the part of the vendor in execution of the transaction. The fleeces at that time were on the sheep, and, as the sheep themselves were not sold, it remained for the vendor to sever the fleeces and put the wool in condition for delivery. The vendor was to deliver it at a certain time and place, and the wool was subject to the further condition of being taken from native sheep and in good merchantable order and condition. So that until these things were done by the vendor, and these conditions were complied with, the contract could not be executed on its part. If the sheep had died before the fleeces were severed, or if after being severed, and before the wool had been delivered at Hay Springs, it had been destroyed by fire or other means, the loss would have fallen upon the vendor.

It is furthermore to be conceded that a sale of personal property to be complete by delivery at a given place, and at a certain price to be paid by the vendee, in the absence of an express contract at a later date, the implication of law is that the payment is to be made in cash at the time and place of delivery. While the title to the property would not pass to the vendee until the purchase money was paid,

it was competent for the parties at the time for delivery to agree either upon an extension of the time of payment or as to the manner thereof. If, without more, the wool when brought to the station at Hay Springs had been weighed and prepared for shipment, notwithstanding Silberman Bros. had placed upon it letters identifying it as their property, and it had been placed in cars for shipment, such acts, in and of themselves, would not have been sufficient to pass the title to the vendee without payment of the purchase money, and in cash, if the vendor had then and there insisted upon such character of payment.

To entitle the plaintiff below to recover in this action, it devolved upon it to show, by satisfactory proofs, that the right of the vendor to exact payment in cash was waived by consenting to some other mode of payment. The evidence shows that the $2,000 paid as earnest money at the time the contract was executed was by check drawn by Taylor on Silberman Bros., without objection; a fact which reasonably led Taylor to expect that a like method of payment would be acceptable when the balance of the purchase money became due. When the wool was brought to the station, and the process of weighing and delivery was complete, Taylor made direct inquiry of Peters as to how he wanted the payment made—whether by draft on Silberman Bros. or by draft of Taylor's bank on Omaha, meaning, of course, the correspondent bank of Taylor's bank at Omaha. That was a clear indication that Taylor did not suppose or apprehend that the presence of so large an amount of currency was expected by Peters to be paid over to him. Payment in such amount in actual cash money, as every business man nowadays knows, is quite unusual. If it was the purpose of Peters to demand the currency, the time for him, as an honest man, to say so was when the question was first put to him by Taylor. That would have enabled Taylor to obtain the money from Omaha before the wool was delivered in the cars, as the law under such circumstances would have accorded this reasonable opportunity for obtaining the currency. Not until after the wool was sacked, weighed, and placed in the cars ready for shipment, and after Peters' mysterious disappearance and visit to Chadron, where his lawyer resided, did he make demand for the currency, when it was then too late for Taylor to obtain the currency, even by telegram, by the coming morning; but he said to Peters that the wool would not be shipped until the money came, not later than the morning after the 16th. In view of his misleading statement when first asked as to the manner of payment, the law would accord to Taylor a reasonable time after demand for the currency in which to produce it.

The foregoing statement of facts is predicated of the evidence developed by the testimony on behalf of the defendant in error, for the reason that in its charge to the jury the court sharply presented the questions of fact on the contradictory statements of the respective witnesses to the determination of the jury, and their verdict authorizes the presumption that they credited the testimony of the witnesses on behalf of the defendant in error and discredited the version given by the witness Peters; the jury doubtless believing that his whole conduct in demanding the currency was influenced by the rise in the mar-

ket value of the wool, and after he had taken advice as to how he could evade the contract.

It is also to be assumed, from the charge of the court, that the jury found the fact to be that after Peters consented that the payment could be made by check, as indicated, the wool was stamped with Silberman Bros.' brand, loaded into the car, and the car closed by Taylor; that the delivery was complete; that all that then remained to be done by Taylor was to tender the check or draft; and that a demand for the currency would not reinvest the property in the wool either in Peters & Williams Company or their vendee—the evidence further showing that Peters put himself out of the way so that he could not be found to make tender of the money immediately when it did come, but it was made to him as soon as he could be found. That the physical possession of the wool was in the railroad company is not disputable, and, as Taylor had directed the agent of the railroad company not to give up the wool, the action of replevin was properly brought against the railroad company and Taylor to recover the possession, if the bank was entitled to the wool. There having been no service of summons in the replevin suit on Silberman Bros., they did not enter appearance in the cause. Although the record shows that they sought to remove the cause from the state court to the United States Circuit Court, that was not an appearance to the merits. Wabash Western Railway Company v. Brow, 164 U. S. 271, 17 Sup. Ct. 126, 41 L. Ed. 431.

Counsel for plaintiff in error presents two principal contentions: (1) That, as Taylor was the agent acting for and on behalf of Silberman Bros., they are bound by the proceedings in replevin; and (2) that after personal property has thus been replevied the party defendant to such action cannot maintain an action in trover for the wrongful conversion of such property against the plaintiff therein.

The Supreme Court of Massachusetts, in White v. Dolliver, 113 Mass. 400, 18 Am. Rep. 502, after review of the authorities of that court, and discussion of the reason of the law, held that one whose property has been taken under writ of replevin in a suit against his agent or bailee can retake it from the party plaintiff, to whom it is delivered, even during the pendency of that action. This ruling has been approved in Westbay v. Milligan, 74 Mo. App. 179; Coen v. Watkins, 62 Mo. App. 502, 505. Cobbey, in his work on Replevin (2d Ed.) § 1233, states the law as follows:

"One whose property has been replevied by a writ against his agent or his bailee can retake it by replevin from the plaintiff in the first action, even during the pendency of that action. One who is a stranger to a replevin suit, and claims the property, may bring replevin against any one except the officer serving the writ. While the property is in his possession it is in custodia legis and is not replevied. Where personal property is in the hands of the plaintiff in an action of claim and delivery, a third person who claims it is not obliged to intervene, but may institute another action of claim and delivery for the property."

These authorities stand to recognized principles of law. As Silberman Bros. were not in fact brought before the court in the replevin suit, no judgment therein could be rendered against them; nor could a judgment therein against Taylor be regarded as res adjudicata as

to Silberman Bros. The settled rule is that, to make a judgment conclusive against a person not named as a party thereto, it must appear that he sustained mutual or successive relationship to the same right of property or subject-matter, such as a personal representative, heir, devisee, legatee, assignee, voluntary grantee, judgment creditor, or purchaser with notice of the fact. Henry v. Woods, 77 Mo. 277. Greenleaf on Evidence, vol. 1, § 523, says:

"No man ought to be bound by proceedings to which he was a stranger. * * * Under the term 'parties,' in this connection, the law includes all who are directly interested in the subject-matter, and had a right to make defense, or to control the proceedings, and to appeal from the judgment. This right involves also the right to adduce testimony, and to cross-examine the witnesses adduced on the other side. Persons not having these rights are regarded as strangers to the cause."

No one is a privy to a judgment whose succession to the rights of property thereby affected occurred previous to the institution of the suit. Freeman on Judgments, par. 162. In Butterick v. Holden, 8 Cush. (Mass.) 233, it was held that, where H contracted to sell land to A, and in wrong of A afterwards conveyed to B, although A had sued H and B in equity for specific performance and failed, yet this judgment was no bar to an action in favor of A against H for breach of contract. In the equity suit, the whole subject-matter of the contract, the consideration, and breach thereof, were gone into and examined, and the court dismissed the bill. Shaw, C. J., said it was a suit between others. "A judgment for the defendant in that suit does not tend to negative defendant's breach of contract, on which this action at law is brought."

The action against Taylor was wholly possessory. The only recovery the bank could have against him would be for the possession of the property, or the value thereof if the possession were in Taylor at the time of the rendition of the judgment. Silberman Bros. had no right to control or direct the defense in that action. They had no right to except to any evidence that might be adduced, or to any ruling of the court, on the trial of that cause. They would have no right to have any judgment rendered therein reviewed. They are not claiming any right or title through or under Taylor. Their right to the property occurred previous to the institution of the replevin suit, and prior to the purchase by the bank. The bank took their property and converted it to its use. It destroyed its identity so that they could not follow and recover it in kind against the bank's assignee.

The underlying foundation of the rule, asserted by the learned counsel for plaintiff in error, which forbids a third person from maintaining the action of replevin or of trover for property taken under writ of replevin, rests upon the sense of legal propriety, that the property being in custodia legis, held by the officer subject to the order of the court, to be surrendered to the rightful claimant in the action, courts will not tolerate the attempted interception of such property in the custody of the law, or to obstruct the function of the court in surrendering it to one or the other of the litigants before it. In Sanborn v. Leavitt, 43 N. H. 473, the court said:

"The writ of replevin requires the sheriff to take the property, not as in an attachment, for the purpose of retaining it, but for the sole purpose of forthwith delivering it to the plaintiff in replevin, who, by the very nature of the process, claims it as his own. When the property has been so delivered, it may be replevied at the suit of another claimant against the party, since he holds this as he does any other property. But the law could not countenance so absurd a thing as to give to every party who claims the property the right to interfere and prevent the officer from doing what it is the purpose of the writ of replevin to require him to do. The property, while it is passing through the hands of the officer, is in the possession of the law, and the law could not be so inconsistent as to issue to its officers, compelled to act at their peril, commands wholly incompatible with each other."

This is aptly illustrated in Donohoe v. McAleer, 37 Mo. 312, where the plaintiff in replevin, after delivery of the property to him by the sheriff, sold and transferred it to a third person. The defendant in his answer set up this fact in abatement of the suit. Wagner, Judge, said:

"When he (the plaintiff) had so reduced it to possession, he had a right to exercise all rights of ownership over it, including its sale and transfer, without impairing any right in the prosecution of his action. Had he been defeated in his suit after he had parted with the property, the defendant would have been entitled to the full value. As it was, the plaintiff ought to have recovered damages for the illegal detention."

Accordingly, in Coen v. Watkins, supra, it was held that, after the property under the delivery order had been turned over by the sheriff to the plaintiff, it became subject to the claim of a third person asserting title thereto.

Under the charge of the court, the jury presumptively found that Silberman Bros. were the owners of the wool when the bank instituted the replevin proceedings. Having thereafter disposed of the property, and converted the proceeds to its use, it became liable in this action to Silberman Bros. for the value of the property at the time of the conversion.

The judgment of the Circuit Court is affirmed.