JOSEPHINE O. SCHURMAN, APPELLANT, v. EDWARD A. PEGAU, APPELLEE.

286 N. W. 921

FILED JULY 11, 1939.   No. 30526.

*O'Sullivan & Southard* and *George B. Thummel*, for appellant.

*Munger & Rhodes, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and JOHNSEN, JJ.

MESSMORE, J.

Plaintiff alleges in her amended petition that the defendant, Edward A. Pegau, held in trust for her the sum of $34,239.13, which was the sale price of 100 shares of stock in the Western Auto Supply Company, in which she claimed ownership, and which stock was sold by the defendant in 1920; that defendant had never accounted to her, and that he is entitled to credit for whatever he has expended for schooling, and prays for an accounting. The answer to the amended petition is a general denial, and pleads estoppel, laches and a parol agreement alleged to have been made by and between defendant and plaintiff, which will be more fully set out in the opinion. The reply denies the making of an oral contract and seeks to credit the defendant with

the sum of $6,900, disbursed by him for schooling, maintenance and income tax assessment, and contains a plea of estoppel. On the issues the trial court found generally for the defendant and dismissed the plaintiff's action. She has appealed from this order, assigning as error that the court's decree is not sustained by the evidence and is against the great weight thereof. This assignment of error requires an analysis of the pertinent evidence. The record is voluminous, and to set out the evidence in detail would unnecessarily lengthen the opinion. We therefore refer to a brief history and the pertinent facts as developed in the record.

Plaintiff was the daughter of John and Grace Schurman. She was born in Fremont, Nebraska, August 9, 1901. Her brother, John Ernest Schurman, was born March 30, 1906. Her father died in 1906, and her mother, Grace Pegau, married the defendant in 1909. The mother at the time was 37 and the defendant 29 years of age. They subsequently removed to Omaha, where they purchased a home, Mrs. Pegau making the down payment and moving her household goods and equipment to Omaha. In 1913 the defendant and one Kohn purchased the Western Auto Supply Company. The defendant borrowed $5,000 from the City National Bank; his wife signed the note, and, in order to obtain further working capital, Mrs. Pegau borrowed in Fremont on her own note the sum of $3,000. She owned one-fourth interest in the corporation, evidenced by certificate of stock, 100 shares, and was the secretary and a director. The profits of the business retired the notes. Subsequently, the defendant procured Kohn's interest in the business, and in 1915 Arthur Storz bought into the business, and Mrs. Pegau's stock was reassigned or indorsed to her husband, the reason given being that Mr. Storz did not desire to be associated in business with a woman. On December 25, 1919, the defendant indorsed 100 shares of stock to Mrs. Pegau and 100 shares of stock to the plaintiff, evidenced by certificate No. 52. The stock remained in his possession in his safe deposit box. The reason for so indorsing the 200 shares of stock, as given by the defendant, was in order to protect

Mrs. Pegau and plaintiff, in the event of his death, and in addition for income tax purposes. Mrs. Pegau always claimed ownership in the stock and requested the indorsement of the 200 shares as hereinbefore stated.

On May 24, 1920, the 200 shares of stock, evidenced by certificate No. 52, were assigned by plaintiff and Mrs. Pegau, each as owner of an undivided half-interest therein, to Arthur Storz, and each consented to the sale and that the consideration therefor be paid to the defendant. The sale of the business was made at that time to Storz, and the consideration for the 460 shares of stock was the release of a note by the defendant to the company for $7,500; $25,000 cash paid on the date of signing the contract May 25, 1920; $25,000 on December 1, 1920; $25,000 on June 1, 1921, $25,000 on December 1, 1921, and $25,000 on June 1, 1922, the deferred payments bearing 6 per cent. interest. The balance of $25,000 was paid at the rate of $1,000 a month, and was for the purpose of requiring the defendant to remain out of business for two years.

Much has been stated in the record as to the finances of this family. We here discuss it, to show the pertinency and association of the family finances with the transaction had, in reference to the indorsement of the stock and the sale of the business. There is a discrepancy in the following testimony: Mrs. Pegau claimed that she and the two children inherited, including life insurance and rents, approximately the sum of $60,000 from her first husband. The figures were fixed in the decree in a divorce action, showing Mrs. Pegau's share of the estate to be $18,286, and the children's share $21,574, which included a 5,000-dollar inheritance to the children from their grandmother, making the total amount of $39,860. In 1918 the family moved to more spacious quarters. The record shows that they lived extravagantly and lavishly, and in this respect they were all transgressors. The inheritance, as above stated, was expended by 1920, apparently for the benefit of the family, and, in addition thereto, a monthly allowance of $150 to $200, given by defendant to his wife. The children at this

time were approximately 14 and 18 years of age. They had been educated out of this amount up to that time.

The question to be determined is whether or not the plaintiff owned the 100 shares of stock. It is admitted that none of the inheritance of either Mrs. Pegau or the two children was ever invested in the business, with the exception of the use of Mrs. Pegau's credit in the first instance. The evidence shows that the money received from the stock was at one time placed in a bank or in Liberty bonds. The defendant stated that it was mostly spent. He testified: "Q. So really, as far as you were concerned, she (referring to plaintiff) owned that one hundred shares of stock, did she? A. Yes. * * * Q. In your estimation at that time did Mrs. Pegau own one hundred shares of stock? A. Yes. * * * A. As far as the stock records were concerned they owned the stock. And they were put,—they were assigned to them in blank for protection and tax purposes. Q. I didn't ask you about the stock records. I asked about as far as you were concerned. Your intention. Did they own the stock? A. Well, my intentions were just as the stock records showed. Q. So that they did own the stock? A. They did own the stock." The foregoing testimony was elicited upon the trial of the divorce action between Mrs. Pegau and defendant. In the instant case, defendant testified on cross-examination: "Q. Now, when you were talking, you didn't deny but what Josephine actually owned this one hundred shares of stock did you? A. No. Q. That is a fact, that she actually owned that stock? A. That is right, so far as the records go * * * So far as the records of the business were concerned it is absolutely correct. * * * Q. And she did own the stock? A. She owned the stock; yes, sure. * * * Q. Now, you knew all the time that Josephine O. Schurman,—you acting as her agent and Gilchrist Company acting for you,—was claiming the absolute ownership of one hundred shares of this stock; you knew that, didn't you? A. In the first place, I only acted as her agent once in signing that paper, and in the second place I knew that she owned a one hundred shares of stock."

Without doubt, the testimony of the defendant shows for itself that he intended the plaintiff to be the owner of the 100 shares of stock. This is further borne out by the record, in that the defendant signed an income tax return, showing the profits from the sale of 100 shares of stock in favor of the plaintiff. In reference to income tax, the defendant testified that he obtained the services of experts, and presumably acting on their advice the transfer of the 200 shares of stock was made, the purpose being to lessen the amount of income tax payable, which would result in no tax in the upper or surtax bracket. A controversy arose, in reference to the ownership of the stock, between the defendant and the United States government. The defendant's claim that he did not own the 200 shares is evidenced by an affidavit furnished by Mrs. Pegau at his request, showing the history of the ownership of the stock and her interest and ownership therein, and also the ownership of the 100 shares in plaintiff, and that they were entitled to the profits from the sale of the stock. Fortifying this evidence is the testimony of the original partner, Kohn, with reference to the ownership of the stock in Mrs. Pegau. We are not concerned with the controversy between this defendant and the government, but we must conclude that the evidence of ownership of the 100 shares, in view of all the circumstances of this case, is clear, unequivocal and convincing, in that plaintiff did, for all intents and purposes, own the 100 shares of stock.

The following questions and answers are also pertinent on this point. Defendant testified: "Q. Well, did Josephine O. Schurman have any interest in the proceeds derived from the one hundred shares of stock sold to Arthur Storz during the year 1920, after May 24th, 1920? A. Yes; she had an interest in that stock until the fall when we came back from California. Q. She had an interest in the proceeds; is that what you intend to say? A. She had an interest in that stock, that share of stock, from the time the sale was made until the agreement was made in the fall before they went to school."

The plaintiff was five years old at the time of her mother's

marriage. She stood in the relationship of a daughter to her step-father, and he assumed the obligations of a father. When the assignment of the 200 shares of stock was made, he presented the instrument to her, and she remarked that she thought she was to read over what she signed; and he told her: "Don't be smart about it, don't talk about it, do it." She then signed the instrument. It is only natural, considering the family relationship, that the plaintiff, then a girl of 18 years, would do as she was told. She had implicit confidence in and respected the defendant's ability and judgment. She knew vaguely of the sale of the business, but knew none of the details.

Defendant's contention is that the trust, if any, as alleged by the plaintiff, is an express trust and arises only from the intentional act of the parties to create it; that in the instant case no words were spoken indicative of any intention to create an express trust, or to recognize its existence, for 17 years, and that the contract dated May 25, 1920, shows a contrary intention, since it is an intentional assignment of the stock by the plaintiff to defendant of any interest that she might have therein. The defendant goes farther, claiming that there were family discussions about finances, concerning the education of the children and concerning extravagances on the part of this plaintiff, and that no mention was ever made by the plaintiff that defendant was holding any money in trust for her.

We believe the evidence shows, by the admission of the defendant, that he intended to create the ownership of the stock in the plaintiff, and so expressed this intention by his acts and conduct. He admitted her ownership of the proceeds of the sale until August, 1920, when he claimed that the parol agreement was made. The facts and circumstances are sufficient to create a trust.

"A trust * * * is a fiduciary relationship with respect to property, subjecting the person by whom the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it." The above defi-

nition is set forth in *Parker v. Bourke,* 131 Neb. 617, 269 N. W. 102.

The defendant's answer alleges a parol agreement had in August or September, 1920, when the plaintiff, Mrs. Pegau, plaintiff's brother and defendant attended and participated in a family conference. The finances, plans and prospects of the family group were discussed, and it was orally agreed by all that Mrs. Pegau and the plaintiff would have no further interest in the proceeds from the sale of the 200 shares of stock, or any right, title or interest therein, or any claim of ownership, and, in consideration of such fact, defendant was to defray the expenses for education of the plaintiff and her brother and make and execute a will leaving all of his estate to Mrs. Pegau, and at her death to go to her children, to the exclusion of his relatives; that the plaintiff subsequently, in 1920, 1921 and 1922, orally ratified and confirmed the family agreement and settlement. The record shows that defendant claims the matter was discussed every summer, and was discussed by the plaintiff in 1923, after she had finished school, wherein she was concerned with the education of her brother. Defendant's contention with respect to the education is that he spent $14,000 for the schooling of the plaintiff and approximately $25,000 for the schooling of her brother. The account, as to exact amounts and dates of payment, as disclosed by the record, is indefinite, but the fact remains that the plaintiff was sent to Kemper Hall and Smith College for at least two years, possibly more, while her brother attended Hill Preparatory School for five years and Yale University for four years. Without question a great deal of money was expended by the defendant for the education and maintenance of plaintiff and her brother during the school period.

The testimony with reference to the making of the oral agreement is that defendant and his wife had talked it over first when they were in an automobile. In the divorce action he testified that he had no discussion with Mrs. Pegau in August or September, 1920, with reference to their affairs or her interest in the stock certificate and

had no discussion with plaintiff relative to her interest therein. There is evidence that a will was made by the defendant at the request of Mrs. Pegau, excluding his relatives and making her the chief beneficiary. This will was destroyed in 1935, after the divorce decree was rendered. The evidence is sufficient to show the expenditure of considerable sums of money by the defendant on the education of the plaintiff and her brother, which would be in keeping with the conception of the oral agreement. We believe that, by the oral agreement, considering the circumstances of the case and that no benefit from the expenditure of the children's inheritance, with respect to further education, inured to them, the evident intent of the parties was that the defendant pay for the education of plaintiff and her brother, and that such amounts as he has expended should be deducted from the proceeds of her interest in the 100 shares of stock.

The defendant pleads estoppel. This defense is based on the following state of facts: The plaintiff finished school in 1923. She was employed in New York and made occasional visits to Omaha. There had been considerable difficulty in the family at all times in reference to money matters, and Mrs. Pegau claimed to be the owner of an interest in the business. The defendant denied her ownership in any part of the business. Many controversies arose in reference to this matter, until Mrs. Pegau consulted some attorneys in reference to an accounting for the 200 shares of stock, as evidenced by certificate No. 52. Suit was brought by her to compel an accounting by defendant. In the divorce action filed in 1934, Mrs. Pegau, by cross-petition, pleaded the ownership of the 200 shares of stock, and asked for $75,000 as the value of the stock, in addition to an allowance for permanent alimony. In 1935 a decree of divorce was granted to the defendant, and the court found that the equities were even, gave Mrs. Pegau $50,000 alimony; stated that $39,860 had been expended on the education of her children, and found that she had no interest or ownership in the 200 shares of stock. Mrs.

Pegau testified in the instant case that, had she prevailed, one-half of the recovery would have gone to the plaintiff in this action. In addition, it is claimed that the plaintiff heard the oral argument in the divorce action wherein the ownership of this stock was discussed; she knew all of the facts and circumstances with reference thereto, and that she is now estopped by her acquiescence to assert any right of ownership in the 100 shares of stock.

With this contention we cannot agree. Mrs. Pegau's suit for an accounting was dismissed without prejudice in 1936. Plaintiff in the instant case testified in the divorce action of her mother as to the allegation of cruelty; that she had been very sick for a period of time. She was not a party to the action and in no manner were her rights adjudicated therein. The ownership of this stock was in the plaintiff for a considerable period before the divorce action was brought.

"Privity depends upon the relation of the parties to the subject-matter, rather than their activity in a suit relating to it after the event. Participation in the defense because of general or personal interest in the result of the litigation does not make one privy to the judgment. *Stryker v. Goodnow*, 123 U. S. 527, 540." *Old Dominion Copper Mining & Smelting Co. v. Bigelow*, 203 Mass. 159, 216, 89 N. E. 193.

"Privity implies a relationship by succession or representation between the party to the second action and the party to the prior action in respect to the right adjudicated in the first action." *Stamp v. Franklin*, 144 N. Y. 607, 39 N. E. 634.

In *Northwestern State Bank v. Silberman*, 154 Fed. 809, the court, in quoting from 1 Greenleaf, Evidence, sec. 523, said: "No man ought to be bound by proceedings to which he was a stranger * * * Under the term 'parties,' in this connection, the law includes all who are directly interested in the subject-matter, and had a right to make defense, or to control the proceedings, and to appeal from the judgment. This right involves also the right to adduce the testimony, and to cross-examine the witnesses adduced on the other

side. Persons not having these rights are regarded as strangers to the cause."

The following rule stated in Jones, Evidence (2d ed.) sec. 290, is pertinent: "The rule allowing the silence of a person to be taken as an implied admission of truth of allegations uttered in his presence * * * does not apply to silence at a *judicial proceeding* or hearing. Thus, it is error to admit evidence that a party to a suit was silent where his adversary testified to certain facts on a former trial which were prejudicial to him. There can be no inference of acquiescence in such case, as the party is not at liberty to contradict the statement of a witness while testifying. He could not interfere and deny the statement. To do this would be to charge the witness with perjury which would be alike inconsistent with decorum and with the rules of law. For similar reasons no unfavorable inference is to be drawn from the silence of a party *during* the comments or *argument* of counsel." The above rule applies to the taking of testimony in open court.

We now come to the defendant's contention of laches; that is: The plaintiff made no demand on the defendant for any part of the moneys alleged to have been held by him in trust for the plaintiff from 1920 until the time of the commencement of this action in June, 1937, or for a period of 17 years.

The defendant testified that there had been constant difficulty in the family for a period of 25 years. The record bears out this testimony. The plaintiff was aware of the situation. She made no demand, and her reason for not doing so is: "In the first place, I thought he was better able to take care of money and make money, and save money than I was, and in the second place, things had not been very (interrupted) * * * Well, the family situation was not a good one, and I did not want to cause a rift. Mother's married life was more important to me, her peace of mind, and I knew if I started anything it would simply throw the whole family situation into a divorce court, and that I felt sure was true. And, on the other hand, I thought that this

will, taking care of me, as I had heard several times, I felt that there wasn't any reason why I should jeopardize the future to take something in the present." The plaintiff further testified she did not know that the defendant claimed ownership of the 100 shares of stock until such time as she heard him testify in the divorce action in reference to the parol agreement.

The situation of the parties has not changed materially since the time of the sale of the stock. Since the sale of the business in 1920 defendant has engaged in business on his own account, and an audit of such business appearing in the record reflects his success. There has been no material change in that respect since the sale of the 100 shares of stock in 1920. The defendant contends that by the delay there has been a material change, to his disadvantage. This is probably based on the fact that he was not able to obtain in detail the accurate amounts expended on the education of plaintiff and her brother and for their maintenance. However, there is evidence that his business records are fairly complete from 1922 to 1934.

The defense of lapse of time, that is, laches, is an equitable one. The lapse of time and the relation of the defendant to the rights must be such that it would be inequitable to permit the plaintiff to maintain her claim.

The defendant cites *Severson v. McKenzie,* 122 Neb. 827, 241 N. W. 774, wherein this court held: " 'Courts of equity have inherent power to refuse relief after undue and inexcusable delay independent of the statute of limitations.' *Hawley v. Von Lanken,* 75 Neb. 597." And in *Abraham v. Ordway,* 158 U. S. 416, 15 S. Ct. 894, it was held: "Independently of any limitation for the guidance of courts of law, equity may, in the exercise of its own inherent powers, refuse relief where it is sought after undue and unexplained delay, and when injustice would be done in the particular case by granting the relief asked."

In the instant case, we believe, the facts and circumstances as disclosed by the entire record offer a reasonable excuse for the delay, and that no injustice results to the defendant

thereby. To sustain this conception of the record, we must look to the facts and circumstances of the particular case. The principle of law from the following cited cases is pertinent:

In *Fawcett v. Fawcett,* 85 Wis. 332, 55 N. W. 405, the court, in quoting from 13 Am. & Eng. Ency. of Law, 674, said: "Where the obligation is clear, and its essential character has not been affected by the lapse of time, equity will enforce a claim of long standing as readily as one of recent origin; certainly, as between the immediate parties to the transaction."

The opinion in *Geiss v. Trinity Lutheran Church Congregation,* 119 Neb. 745, 230 N. W. 658, sets forth a number of authorities which are pertinent to the proposition here involved, and found on page 751:

"In *Galliher v. Cadwell,* 145 U. S. 368, 36 L. Ed. 738, it was held: 'Laches does not, like limitation, grow out of the mere passage of time; but it is founded upon the inequity of permitting the claim to be enforced—an inequity founded upon some change in the condition or relations of the property or the parties.'

"In a note to *Felix v. Patrick,* 36 L. Ed. (145 U. S. 317) 719, 720, we find the following: 'The objection of laches is not tenable to defeat an equity cause, where there has been no material change in defendant's position.' * * *

"In *Garden Cemetery Corporation v. Baker,* 218 Mass. 339, it was said, in effect, that, where no one has been misled to his harm in any legal sense by the delay and the situation has not materially changed, the delay is not fatal. And in *Kentucky Block Cannel Coal Co. v. Sewell,* 249 Fed. 840, it was held that, the defense being an equitable one, the lapse of time and the relations of the defendants to the rights must be such that it would be inequitable to permit plaintiffs to maintain their rights. * * *

"In *Hawley v. Von Lanken,* 75 Neb. 597, it was held: 'In applying the doctrine of laches the true inquiry should be whether the adverse party has been prejudiced by the delay in bringing the action and whether a reasonable excuse is offered for the delay.' "

The rule in *Hawley v. Von Lanken, supra,* was reaffirmed in *Harrison v. Rice,* on rehearing, 78 Neb. 659, 114 N. W. 151, and a similar rule was announced in *Northwest Ready Roofing Co. v. Antes,* 117 Neb. 121, 219 N. W. 848.

In granting the plaintiff relief, we again review the contract for the sale of the stock in question. The actual amount of the stock, in which plaintiff had an interest, must be based upon the figure of $125,000. The release of the 7,500-dollar note was a personal consideration and affected only the defendant. The $25,000 paid in monthly instalments was personal to the defendant for not engaging in the business for a period of two years; it constituted no part of the sale of the stock. Therefore, plaintiff's share of the proceeds of the sale of the stock is 100/460 of $125,000. The ratio of the plaintiff's interest in the $125,000 is placed at 21.7 per cent., or in an amount equal to $27,125. This constitutes the value of her 100 shares of stock.

Having found that the plaintiff is entitled to an accounting and using the above amount as a basis, fixing the rate of interest at 6 per cent. as being equitable in view of the fact that the contract of sale of all the stock called for 6 per cent., and making the proper deductions as credits that should be allowed the defendant for the education and maintenance of plaintiff and her brother, we find that there is due and owing from the defendant to plaintiff the sum of $7,810.95, for which amount plaintiff is entitled to judgment, with interest thereon at the rate of 6 per cent. per annum from June 11, 1939.

The judgment of the district court is reversed, with directions to enter judgment in accordance with this opinion.

REVERSED.

CARTER and JOHNSEN, JJ., dissent.