Robert L. COOK, Debtor.

Martin T. Buchholz, Plaintiff,

v.

Robert L. Cook, Defendant.

Bankruptcy No. 00–00828S.
Adversary No. 00–9089S.

United States Bankruptcy Court,
N.D. Iowa,
Western Division.

March 28, 2001.

Wil L. Forker, Sioux City, IA, for debtor.

Steven R. Jensen, Sioux City, IA, for plaintiff.

## DECISION

WILLIAM L. EDMONDS, Bankruptcy Judge.

Martin T. Buchholz asks that Robert L. Cook's debt to him be excepted from discharge under 11 U.S.C. § 523(a)(4) and (a)(2)(A). Trial was held February 21, 2001 in Sioux City. Steven R. Jensen appeared as attorney for Buchholz; Wil L. Forker appeared as attorney for the debtor, Robert L. Cook. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

### *Findings of Fact*

Martin T. Buchholz is 91 years old and lives in a nursing home. He was not able to attend the trial. Robert L. Cook is his nephew and godchild. Cook is in his early fifties; he attended college for two years. In the spring of 1997, Cook began regular visits to his uncle's home in Bancroft, Nebraska. Cook also lived in Bancroft. Cook worked the night shift for Gateway computers in North Sioux City, South Dakota. He would visit his uncle during the day and sometimes at night when he got off work. He would often help Buchholz with his housework.

Before the spring of 1997, Cook's Aunt Fern was helping Buchholz with his finances. Buchholz was one of 15 children. Other family members, including Buchholz's younger brother Willis and his sister-in-law Phyllis, wanted someone other than Fern to help Buchholz with his finances. Cook agreed to do it, but he wanted some other family member to help also. In early May 1997, Buchholz executed a "Durable Power of Attorney" naming Cook his attorney-in-fact with authority to control Buchholz's bank accounts, real estate, and personal property. The power gave Cook the authority to gift or to sell any of Buchholz's property. The power of attorney was drafted by Buchholz's attorney and executed at the attorney's office. On the day Buchholz executed the power of attorney, Cook called Phyllis and asked her to come to the attorney's office so that she also could be given power of attorney for Buchholz. Phyllis is employed as the Clerk of Court for Thurston County, Nebraska. She went to the lawyer's office and either the same day or soon after, Buchholz signed a Durable Power of Attorney naming Phyllis also as his attorney-in-fact (exhibit 4).

Buchholz kept control of his checkbook, continuing to sign checks. Cook also signed checks to pay some of Buchholz's bills. At the time, Buchholz was 88 or 89 years old.

Prior to 1997, Cook went through a divorce. Afterward he had substantial debts. At Gateway he earned $8.50 per hour. He had very little money left over each month after paying his basic, necessary living expenses. He was "living paycheck to paycheck."

In February 1998, Cook began dating Irene Dewey, a fellow employee at Gateway. She also was going through a divorce. She had separated from her husband in December 1997. At the time, she was living on an acreage near Akron, Iowa. She sold the acreage and used the equity for the downpayment to buy a house at 941 Reed Street in Akron. At the time of the purchase, in May 1998, the warranty deed for the home was made to Dewey and Cook as joint tenants with rights of survivorship. The purchase price of the home was $111,000.00. Dewey and Cook signed a promissory note to Firstar Bank for $88,000.00 to finance the purchase. In August 1999, Cook quitclaimed his interest in the house to Dewey. Cook has referred to Dewey as his "paramour." He has lived with her "on and off" since they began dating. They became engaged about a year ago.

On December 10, 1997, Buchholz signed a check for $38,000.00 to the First National Bank to enable Cook to obtain a cashier's check for that amount. Cook used the cashier's check to start an investment fund in his own name at Norwest Bank in Sioux City. However, the fund was for Buchholz's benefit. Cook offered to help Buchholz with his investments, and Cook had discussed his idea for the investment account with Buchholz and Phyllis. Cook said he was told by Buchholz to put the investment account in Cook's name. Cook told Phyllis that he was supposed to put it in Cook's and Phyllis' names but that he put it in his name only because he did not know her social security number.

On March 10, 1998, Cook obtained a second cashier's check from First National Bank in Bancroft (attachment to exhibit 2). It was in the amount of $26,000.00. Cook testified that he used the money to pay off his own debts, but he testified that some may have been transferred to Irene Dewey. In a deposition, he admitted that the money went to Dewey to enable her to pay off her debt on her Jeep motor vehicle. I find that Cook transferred the entire $26,000.00 to Dewey for her use. Cook

testified that he considered it a loan to Dewey. He said he expected to be repaid, but he did not discuss repayment terms with her because of their relationship.

On April 28, 1998, Cook obtained a third cashier's check from First National Bank (attachment to exhibit 2). It was in the amount of $38,000.00. Cook said he used the money to pay his debts and some of Dewey's debts.

Cook maintains that the $26,000.00 he received in March and the $38,000.00 he received in April were loans from Buchholz. He said he discussed the loans with his uncle and that he promised to pay his uncle back. Cook said the money came from Buchholz's bank account. It may be that bank certificates of deposit owned by Buchholz were redeemed in order to obtain the March and April cashier's checks.

On a visit to Buchholz, Willis Buchholz learned from Martin that Martin's checking account was overdrawn. Willis, Martin, and Phyllis visited Cook in Akron sometime in late April, seeking an explanation. Cook's only explanation was that Phyllis must have been writing checks.

Willis said he examined Buchholz's checking account and discovered the transactions leading to the purchase of the cashier's checks. He drove to Gateway to talk to Cook and confronted him about the checks. He said he got "no real answer."

Cook's power of attorney was revoked. Buchholz gave Willis power of attorney. Willis and Phyllis, on Buchholz's behalf, reached an agreement with Cook on the return of funds (exhibit 2). Both sides were represented by attorneys. A "Letter of Understanding" was executed on June 16, 1998.

Under the agreement, Cook agreed to return the balance of the investment account at Norwest. Cook agreed to have his house in Bancroft appraised and to transfer the property to Buchholz. The value of the transfer would be determined by the valuation of an appraiser to be selected jointly by the attorneys. After the return of the investment account and the transfer of the Bancroft property, any remaining balance of the $102,000.00 would be repaid within 60 days. The agreement provided for the execution of a promissory note for the unpaid balance and the execution of a deed of trust or mortgage to secure the unpaid balance. It is not clear from the agreement whether there was additional property to be used as security for the unpaid balance or whether the parties intended that the Bancroft home was to be mortgaged until it was transferred (see §§ 2 and 3, exhibit 2). The lack of clarity on this point does not affect the court's decision.

Cook signed a promissory note to Buchholz for $50,000.00 (exhibit E) and a Deed of Trust (exhibit C). The Bancroft property was never sold or transferred to Buchholz. Cook mortgaged the property to Countrywide Home Loans, Inc. to obtain money to pay debts including legal bills.

Of the $38,000.00 invested through Norwest, only $27,000.00 was returned to Buchholz. These funds were returned on August 6, 1998. Cook claims that stock market losses caused the shortfall. He testified that if he had not been forced to cash in the investment, Buchholz would have earned ten times his investment. The documentary evidence does not bear out the stock market loss explanation.

As of April 30, 1998, the investment account contained the following shares of stock:

| | |
|---|---|
| money market fund | 23.98 shares |
| AIM Value Fund | 272.093 shares |
| Fidelity Advisor High Yield | 1,217.999 shares |
| Norwest ADV Small Company | 931.966 shares |
| Norwest ADV Income Equity | 263.462 shares |

The total value of the portfolio was then $47,983.29 (exhibit 9).

As of May 29, 1998, the investment account was valued at $28,857.47 (exhibit 9). The per share value of the funds was not significantly different, but the number of shares was. The shares at the end of May were as follows:

| | |
|---|---|
| money market fund | 24.08 shares |
| AIM Value Fund | 141.615 shares |
| Fidelity Advisor High Yield | 861.537 shares |
| Norwest ADV Small Company | 558.060 shares |
| Norwest ADV Income Equity | 151.316 shares |

As of June 30, 1998, the value of the portfolio was $29,246.67 (exhibit 9). Cook did not explain the loss of shares.

In addition to the return of the Norwest money, Cook paid Buchholz only $1,200.00. As stated earlier, Cook did not transfer the house to Buchholz or sell it and pay him the proceeds. In an effort to collect the debt, Buchholz filed suit against Cook in May 1999 in the Nebraska state court. Cook filed his chapter 7 bankruptcy case in this court on April 6, 2000.

Cook explains the $64,000.00 in cashier's checks he received in March and April of 1998 as loans agreed to by Buchholz. Cook said he needed the money to pay his debts and that he had a three-fold plan for repaying it. First, the Norwest investment account would earn enough money to repay Buchholz. This explanation was incredible. The investment account was indisputably Buchholz's money. Using its earnings to repay Buchholz's loan to Cook makes no sense.

Second, Cook said he proposed to transfer his house in Bancroft to Buchholz. The reason he did not, he says, is that Phyllis would not let him. Third, Cook was to pay Buchholz something every month. Cook said that Buchholz said he was willing to take whatever Cook could afford to pay. Cook said that at one point, Buchholz was willing to take $100.00 to settle the entire debt in full.

Cook said he and Buchholz were "close," that he intended to pay Buchholz back, and that he did not take Buchholz's "last penny." Cook says Buchholz is worth "a million dollars." At the time of Cook's bankruptcy filing, Cook owed Buchholz $73,800.00.

### Discussion and Conclusions of Law

#### A. Norwest Investment Account

Buchholz contends that Cook's failure to return $11,000.00 of the investment fund was the result of defalcation by Cook while Cook was acting as Buchholz's fiduciary. To support his argument that Cook was acting in a fiduciary capacity, Buchholz relies on Cook's status as attorney-in-fact. Cook argues that an attorney-in-fact is not a fiduciary within the meaning of 11 U.S.C. § 523(a)(4).

The Bankruptcy Code provides that an individual debtor in a chapter 7 case is not discharged from any debt "for fraud or defalcation while acting in a fiduciary capacity . . . ." 11 U.S.C. § 523(a)(4). Whether a relationship is a fiduciary relationship within the meaning of 11 U.S.C. § 523(a)(4) is an issue of federal law. *Tudor Oaks Ltd. Partnership v. Cochrane (In re Cochrane)*, 124 F.3d 978, 984 (8th Cir. 1997), *cert. denied*, 522 U.S. 1112, 118 S.Ct. 1044, 140 L.Ed.2d 109 (1998). " '[T]he fiduciary relationship must be one arising from an express or technical trust that was imposed before and without reference to the wrongdoing that caused the debt.' " *Id.* (quoting *Lewis v. Scott*, 97 F.3d 1182, 1185 (9th Cir.1996)); *accord Devaney v. Dloogoff (Matter of Dloogoff)*, 600 F.2d 166, 168 (8th Cir.1979) (applying § 17(a)(4) of the Bankruptcy Act). The defalcation exception does not apply to a constructive trust or mere contractual relationship.

*Werner v. Hofmann,* 5 F.3d 1170, 1172 (8th Cir.1993).

Bankruptcy courts regularly look to state law to determine whether a fiduciary capacity exists. *Barclays American/Business Credit, Inc. v. Long (In re Long),* 774 F.2d 875, 878 (8th Cir.1985); *Dutton v. Kondora (In re Kondora),* 194 B.R. 202, 208 (Bankr.N.D.Iowa 1996); *Smith v. M & M Commodities, Inc. (In re Smith),* 72 B.R. 61, 62 (N.D.Iowa 1987). "The 'technical' or 'express' trust requirement is not limited to trusts that arise by virtue of a formal trust agreement, but includes relationships in which trust-type obligations are imposed pursuant to statute or common law." *LSP Investment Partnership v. Bennett (Matter of Bennett),* 989 F.2d 779, 784–85 (5th Cir.1993), *cert. denied,* 510 U.S. 1011, 114 S.Ct. 601, 126 L.Ed.2d 566 (1993). State law is therefore important in determining whether a party has acted in a fiduciary capacity. *Tricentrol Overseas, Ltd. v. Touchstone (Matter of Touchstone),* 149 B.R. 721, 727, *supplemented by,* 153 B.R. 955 (Bankr.S.D.Fla.1993).

Counsel for the parties have not indicated which state's law ought to be considered in determining whether Cook was acting in a fiduciary capacity in investing Buchholz's money. It appears they think that Nebraska law should apply. Absent a designation by the settlor, an *inter vivos* trust of interests in movable property is valid if it is valid under the local law of the state with which, as to the issue under consideration, the trust has the most significant relationship. Restatement (Second) of Conflict of Laws § 270(b) (1969). As to whether Buchholz intended to create a trust for his benefit, I conclude that the state with the most significant relationship to this issue is Nebraska. It was the state where Buchholz was domiciled. It was also Cook's domicile at the time. It was the location where the men had the discussion on the investment, and it was the location where the funds were transferred from Buchholz to Cook. Notwithstanding that the money was invested by Cook in Iowa, if a valid trust was created, it was created in Nebraska.

There was no writing creating a trust; however, one was not necessary to create a trust interest in personalty under Nebraska law. *Simon v. Simon,* 141 Neb. 839, 5 N.W.2d 140, 142 (1942); *Wolf v. Haslach,* 65 Neb. 303, 91 N.W. 283, 285 (1902). This is so also in Iowa. *Butler v. Butler,* 253 Iowa 1084, 114 N.W.2d 595, 612 (1962). In Nebraska, a writing is required to establish a trust in real estate. Neb.Rev.Stat. § 36–103 (1943).

"A trust creates a fiduciary relationship in which one person holds a property interest subject to an equitable obligation to keep or use that interest for the benefit of another." *Karpf. v. Karpf,* 240 Neb. 302, 481 N.W.2d 891, 896 (1992). A trust arises from a manifest intention to create it. *Schurman v. Pegau,* 136 Neb. 628, 286 N.W. 921, 924 (1939).

I find that Buchholz and Cook intended that a trust be created. Buchholz was the settlor. He transferred the $38,000.00 to Cook who was to act as trustee and invest the money for Buchholz's benefit. Cook took title to the property. He was to manage and invest the property in his own name. I conclude that in investing the money in the Norwest account, Cook was acting in a fiduciary capacity as an agent-trustee for Buchholz.

The parties seem to place great importance on whether the power of attorney made Cook Buchholz's fiduciary. That Buchholz named Cook his attorney-in-fact certainly is indicative of the trust he placed in Cook in the ordinary sense.

However, the power of attorney is not otherwise relevant to the issue of Cook's fiduciary capacity as to the Norwest investment. Although an agent with a power of attorney is a fiduciary to his principal, *Cheloha v. Cheloha*, 255 Neb. 32, 582 N.W.2d 291, 297 (1998), the power of attorney, in this case, was not used by Cook in the transfer of the money or the creation of the investment. Buchholz wrote out the check that purchased the cashier's check made payable to Cook. Cook took the money in his own name and invested it in his own name. Cook took, held, and managed the money as trustee of an express trust, not as an attorney-in-fact.

 The remaining issue as to the Norwest account was whether Buchholz's losses resulted from defalcation by Cook. "Defalcation includes a broad range of misfeasance...." *Smith v. M & M Commodities, Inc.*, 72 B.R. 61, 63 (N.D.Iowa 1987). "Defalcation" is construed broadly, and it is evaluated by an objective criteria. It is not necessary to show intentional fraud or other intentional wrongdoing. *Tudor Oaks Ltd. Partnership v. Cochrane (In re Cochrane)*, 124 F.3d 978, 984 (8th Cir. 1997). It is not necessary to show bad faith. *Dutton v. Kondora (In re Kondora)*, 194 B.R. 202, 208 (Bankr.N.D.Iowa 1996).

> Defalcation is defined as the "misappropriation of trust funds or money held in any fiduciary capacity; [the] failure to properly account for such funds." Under section 523(a)(4), defalcation "includes the innocent default of a fiduciary who fails to account fully for money received." ... An individual may be liable for defalcation without having the intent to defraud.

*Cochrane*, 124 F.3d at 984 (quoting *Lewis v. Scott*, 97 F.3d 1182, 1186 (9th Cir.1996)).

 I find that the loss in the Norwest investment resulted from Cook's defalca-

tion. Cook received $38,000.00 from Buchholz to invest on his behalf. He invested the money with Norwest in mutual funds involving securities. When asked to return the money, he returned only $27,000.00. His only explanation for the shortfall was that there had been losses in the stock market. Yet this explanation is not supported by the evidence. From April 30, 1998 to May 29, 1998, there was a significant decrease in the number of shares of stock in the portfolio. Cook provided no explanation for this decrease. He provided no explanation other than "stock market loss." He has failed properly to account for all of the funds entrusted to him by Buchholz. It is true that from May 29, 1998 to June 30, 1998 there was no decrease in the number of shares, yet the value of the portfolio dropped, for that period, possibly because of market losses. He returned any remaining funds on August 6, 1998. Because only three investment account statements were offered or admitted into evidence, I cannot determine whether the difference in value of the portfolio as of May 29, 1998 and August 6, 1998 was entirely because of stock market losses or entirely because of the disappearance of shares or a combination of these two possibilities. As Cook has made no credible attempt to account for the losses, I find that the entire loss of value from $38,000.00 to $27,000.00 resulted from Cook's defalcation.

### B. The Two Remaining Cashier's Checks

Buchholz contends that his losses of $26,000.00 and $38,000.00 represented by the cashier's checks dated March 10, 1998 and May 28, 1998 were the result of Cook's fraudulent misrepresentations. He says Cook borrowed the money, but he never intended to repay the loans, and that thus the debt should be nondischargeable under

11 U.S.C. § 523(a)(2). Alternatively, Buchholz contends that Cook, using the power of attorney, helped himself to the money and used it for his own benefit, a defalcation under 11 U.S.C. § 523(a)(4). Buchholz says the evidence supports either theory.

I find that Cook borrowed the money from Buchholz, promising to repay it, but he never intended to do so. I conclude that Buchholz's claim for the $64,000.00 is nondischargeable under 11 U.S.C. § 523(a)(2)(A). I do not reach the issue of whether the claim is also nondischargeable as a defalcation under 11 U.S.C. § 523(a)(4).

■■■■ An individual debtor's discharge under 11 U.S.C. § 727 does not discharge him or her from any debt for an extension of credit to the extent obtained by "false pretenses, a false representation, or actual fraud...." 11 U.S.C. § 523(a)(2)(A). For a debt to be nondischargeable under this section, Buchholz must prove:

(1) the debtor made the false representations;

(2) that at the time, he knew they were false;

(3) that he made them with the intention and purpose of deceiving the creditor;

(4) that the creditor relied on such representations;

(5) that the creditor sustained the alleged loss and damage as the proximate result of the representations having been made.

*Thul v. Ophaug (In re Ophaug),* 827 F.2d 340, 342 n. 1 (8th Cir.1987). The creditor's reliance on the misrepresentations must have been justifiable. *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 439, 133 L.Ed.2d 351 (1995). Buchholz must prove each element of his claim by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991).

■■■■ Cook obtained loans from Buchholz on two occasions—one loan in March 1998 for $26,000.00 and a loan in May 1998 for $38,000.00. Each time he promised to repay the loans in the future. A promise to perform a future act is an actionable representation only when made with an existing real intention not to perform. *Hagarty v. Dysart–Geneseo Comm. School District,* 282 N.W.2d 92, 95 (Iowa 1979); *Grefe v. Ross,* 231 N.W.2d 863, 867 (Iowa 1975).

■■■■ I find that Cook made the promises to Buchholz to repay the loans with a then-existing, real intention not to perform them. I infer this intent from the circumstantial evidence. Buchholz is an elderly man; Cook thought he was wealthy. Cook was having difficulty financially, so was his paramour. He borrowed the money from Buchholz to satisfy some of his creditors, and he transferred a significant amount to Irene Dewey so she could pay her debts. He had been in a romantic relationship with Dewey for a very short period. They were going to be married. Although Cook said he loaned her the money, I do not think she thought so. She thought it was a gift. In any event, he never discussed repayment terms with Dewey. She also has filed bankruptcy. Cook was living from "paycheck to paycheck" with little if anything left over each month after the payment of his necessary living expenses. He was earning only $8.50 per hour from his employment at Gateway. He was in no position to repay the loans. I do not believe his assertions that he intended to repay the loans. Cook was not a credible witness; he was evasive, argumentative, and he claimed not to remember events and facts that one normally ought to remember. I think it more likely that Cook

borrowed the money thinking that Buchholz was rich and would not need it or miss it and that when Buchholz died, there would be no evidence of the loans. I think it likely that his motive for misrepresenting his intentions to Buchholz was his desire to please his new girlfriend. Cook had been dating Dewey less than two months when he transferred the $26,000.00 to her. After dating her at most for three months, he gave her another $38,000.00. All of it was ill-gotten from Buchholz.

Cook knew the representations were false because he knew he would not repay the loans, indeed that he could not repay them. He made the representations to Buchholz in order to deceive him into lending him the money. Buchholz's reliance on the representations was justifiable. The borrower was his nephew; he trusted him with his own financial affairs. He placed sufficient trust in Cook to give him a power of attorney over Buchholz's finances. No evidence has been presented to show that there was anything to alert Buchholz that his reliance was not justified.

Buchholz's losses were sustained as a result of the fraudulent misrepresentations by Cook. I find that Buchholz's damage of $64,000.00 was the proximate result of Cook's fraud. Cook has repaid only $1,200.00 of the loss.

### Damages

After considering the return of the $27,000.00 investment account and the $1,200.00 repayment by Cook, Buchholz has been damaged in the amount of $73,800.00. He will recover judgment in that amount; the judgment will be excepted from discharge in accordance with the above findings and conclusions pursuant to 11 U.S.C. § 523(a)(4) and (a)(2)(A).

### ORDER

IT IS ORDERED that Martin T. Buchholz shall recover from Robert L. Cook the sum of $73,800.00. This recovery is excepted from Robert L. Cook's discharge under 11 U.S.C. § 523(a)(4) and (a)(2)(A). Costs are taxed to Robert L. Cook. Judgment shall enter accordingly.