Rolland E. GREFE, Trustee of the Mary
A. Closz Trust, Plaintiff,

v.

R. L. ROSS, Defendant.

R. L. ROSS, Cross-Petitioner-Appellee,

v.

Herbert O. HAWS and Hynes & Howes
Real Estate, Inc., Defendants to
Cross-Petition-Appellants.

No. 2–57299.

Supreme Court of Iowa.

July 31, 1975.

Joseph A. Grubisich, Shifley, Hora & Grubisich, Davenport, for appellants.

Lund & Chambers, Webster City, for appellee.

Heard before MOORE, C. J., and RAWLINGS, LeGRAND, REYNOLDSON and McCORMICK, JJ.

McCORMICK, Justice.

Cross-petition defendants appeal a judgment awarding cross-petitioner actual and exemplary damages for fraud arising out of a home construction franchise transaction. The action commenced as a suit by plaintiff Rolland E. Grefe, Trustee of the Mary A. Closz Trust, against defendant R. L. Ross, seeking specific performance of a land purchase contract. Ross cross-petitioned against Hynes & Howes Real Estate, Inc. (company) and Herbert O. Haws, seeking actual and exemplary damages on several theories including fraud. Grefe obtained judgment against Ross. That judgment was not appealed. Ross's action against the company and Haws was separately tried to the court at law, jury having been waived. The trial court found for Ross against the company and Haws on the fraud theory, did not pass on Ross's alternative theories, and awarded Ross $58,500 actual damages and $100,000 exemplary damages. The company and Haws appealed. We affirm the trial court.

The appeal presents three questions. Is the trial court's finding of fraud supported by substantial evidence? Did the trial court correctly hold Haws personally liable? And, did the trial court abuse its discretion in overruling the motion for new trial of the company and Haws?

■ I. *The finding of fraud.* In order to prove fraud, it was necessary for Ross to establish each of the following elements by a preponderance of clear, satisfactory, and convincing evidence: (1) representation, (2) falsity, (3) materiality, (4) scienter, (5) intent to deceive, (6) reliance, and (7) resulting injury and damage. *Hall v. Wright,* 261 Iowa 758, 766, 156 N.W.2d 661, 666 (1968).

In evaluating the sufficiency of the evidence, we view it in its light most favorable to sustaining the court's judgment. We need only consider the evidence favorable to the judgment, whether or not it is contradicted. The trial court's findings of fact are binding upon us if supported by substantial evidence. A finding of fact is supported by substantial evidence if the finding may reasonably be inferred from the evidence. *Meade v. Roller,* 212 N.W.2d 426, 429 (Iowa 1973). The relevant evidence will be discussed here from this viewpoint.

Ross was a tavern owner from Webster City who had owned some real estate for investment purposes. He had no experience in real estate development or home construction. Richard Obe was a Webster City real estate agent. He had once attempted to develop a housing subdivision in the town of Ellsworth, which he described as an unsuccessful venture.

The company was one of a group of related corporations headquartered in Davenport. Haws was its president. The company was attempting to sell home construction franchises, particularly in rural communities in Iowa. It claimed to offer stability, growth, and profit potential resulting from bringing "self-supporting" and "complementary activities" together to function as a "congeneric." The company described itself as the hub of a wheel with spokes consisting of expert affiliates in housing, banking, financing, insurance, and investments. Its salesmen said the wheel would carry everyone involved with it forward to prosperity.

As a matter of fact the company had not made a profit since at least 1968. It appears that the only way the congeneric wheel was kept moving during the times material here was by sales of franchises and stock sales. It is reasonable to infer that the company's promises far exceeded its ability to keep them.

In December 1971, Obe discussed purchase of a home construction franchise with one Robert Gahn and other representatives of the company. Obe testified Gahn described the "congeneric wheel" to him in an effort to sell him a home construction franchise. He said Gahn told him the company would provide all services including financing for development of a real estate subdivision in the Webster City area. This included advice regarding development sites, assistance with zoning changes, help in obtaining Federal Housing Authority approval of the homes, conduct of home sales seminars in the area, supplying home pricing data, providing a phone service to communicate with the company, and furnishing other development and planning services.

Based upon these representations, Obe paid the company $6000 for a franchise for the Webster City area. Gahn subsequently made these same representations to Ross who, as a result, in January 1972 purchased one-half of Obe's interest in the Webster City franchise for $3000. Gahn received a 35 percent commission upon sale of the franchise. Haws testified the company netted only $900 from the transaction. He acknowledged the company had sold few, if any, franchises previously.

The franchise gave Obe and Ross the exclusive right to use the trade name "Hynes and Howes Construction Company" within an area including Webster City for a three-year period, subject to renewal. They were to follow various rules of the company. They were to sell pre-cut homes to be built by the company. The company was to furnish $180 worth of advertising for each house constructed and was to provide a phone service for pricing information, access to a lending institution for financing, and some bookkeeping services. Obe and Ross were to receive 50 percent of the net profit, before taxes, on each house sold. No mention was made in the agreement of the other services promised.

In February 1972, Ross paid $500 for an option in his name alone to purchase about 43 acres of land on the south city limits of Webster City for $83,000. A development planning firm was hired by Ross, with mon-

ey loaned by the company, to prepare preliminary platting and development plans. In March 1972, Obe and Ross went to Davenport with these plans. Company representatives were enthusiastic and encouraged them to pursue the development. John Howes, secretary of the company, assured them of financing for the project.

Although Howes, Haws and other company witnesses denied at trial that the company promised to finance the development, Charles Staudahar, a former officer of the company, testified, "The congenerate corporations were to provide funds through security agreements to do the development." Staudahar also testified that time was of the essence because of rising costs, a good housing market in 1972, and a favorable climate in Webster City for housing development.

In April 1972, Haws viewed the property and "approved it." He refused to loan Obe and Ross money for the development as originally promised. He said the company had no money to loan. After considerable discussion, he entered an agreement with Obe and Ross in behalf of the company, which was reduced to writing. Stock salesmen would attempt to raise $105,000 by sale of common stock of the company in the Webster City area. Obe and Ross were to help with the stock sale. If the stock sale was successful, the net proceeds were to be loaned to Obe and Ross to complete the purchase of the Closz land. With considerable assistance from Ross, the stock sale was successful. Haws testified that after payment of a 15 percent sales commission the company netted about $92,000.

In June 1972, Ross entered a contract with the Closz Trust to purchase the land. $5000 was paid down. The balance of $78,000 was to be paid October 1, 1972.

In the meantime the company did not deliver the services promised. Although a representative of the company assisted Obe and Ross in seeking FHA approval of the development site, most of the work in obtaining a zoning change in Webster City was done by Obe. No Webster City sales seminars were held. One poorly-attended seminar was held in Eagle Grove. Pricing data on homes was not supplied when requested.

After considerable delay on the part of the company, Ross began to suspect the company would not keep its promise to loan the money for the land purchase. Finally, the company refused to lend the money unless Obe and Ross would enter a new franchise agreement. Under the new franchise agreement, Obe and Ross would be the salesmen and builders. They would receive a license to build company homes for one year, subject to renewal for one year at a charge of $1000. They would be required to follow the company's operating rules, attend training schools at their own cost, construct a model home, and use only company building materials. The company promised to provide the training schools and various other materials and services, most of them for stated fees. Upon legal advice, Obe and Ross refused to enter the new franchise agreement. The company persisted in its refusal to loan the money to permit them to complete the land purchase.

Obe and Ross terminated their relationship with the company. When they did not pay the $78,000 balance on the land contract on October 1, 1972, this lawsuit was initiated. The judgment entered for plaintiff against Ross for the amount due was later satisfied by him.

There was considerable evidence regarding Ross's injury and damages. The franchise proved worthless. The land he purchased decreased substantially in value. He was caused considerable expense. He lost the benefit of his bargain. Staudahar, the former company officer, testified $100,000 profit could have been realized in 1972 if the project had been carried out.

■ The evidence supports the trial court's finding that each element of fraud was established. Examined in its light most favorable to those findings, the evidence demonstrates a reckless pattern of

representations and promises to Ross which induced him to purchase an interest in the original franchise and to enter the land purchase contract. The company did not have the capacity to keep its promises. It lacked experience, capital and qualified personnel. It was long on promotion but short on performance. Company officials promised Ross what they believed they had to in order to foster his investment. Then they promised him what they believed necessary in order to encourage the land development. They used grandiose representations about the Webster City development, one of their first franchise sales, to sell other franchises and to promote the company. When the company and Haws were backed against the wall by their unwillingness to keep their promise to finance purchase of the development land, the scheme unwound.

The trial court accepted Ross's testimony that the company promised to provide numerous franchise services and finance development costs. In addition to denying these promises were made, the company and Haws admitted the company had neither the capacity nor the intention to fulfill them. In the one instance the company admitted a promise, manifested by the agreement to loan Ross proceeds of a stock sale to purchase the development land, the company and Haws broke the promise by imposing a new condition on it. The court was justified in finding the company and Haws made materially false representations, with knowledge they were false, from an intent to deceive Ross, which Ross relied upon, causing him substantial injury and damage.

The company and Haws dispute Ross's version of events. However, the trier of fact resolved that dispute in Ross's favor. Even under his version of events, the company and Haws contend the evidence was insufficient to show representations or an intent on their part to deceive Ross.

They assert statements made were simply expressions of opinion and not representations of fact, and they also argue promises made involved future acts and are not actionable.

■ We adhere to the rule that an opinion expressed for the deliberate purpose of deceiving another is treated as a statement of fact. *Owens v. Norwood-White Coal Co.*, 188 Iowa 1092, 174 N.W. 851 (1920). Similarly, we follow the rule that a promise to perform a future act is an actionable representation when it is made with an existing real intention not to perform. *Lamasters v. Springer*, 251 Iowa 69, 99 N.W.2d 300 (1959). In the present case, the trier of fact could find the statements made to Ross were actionable representations in accordance with these principles.

■ The contention regarding insufficiency of the evidence on the issue of intent to deceive is also based upon a misconception of the law. The company and Haws maintain that an affirmative intent to deceive must be shown. However, it is well established that intent to deceive and the closely related element of scienter are shown not only when the speaker has actual knowledge of the falsity of his representations but also when he speaks in reckless disregard of whether his representations are true or false. A false statement innocently but mistakenly made will not establish intent to defraud, but, when recklessly asserted, it will imply an intent to defraud. *Hall v. Wright, supra*, 261 Iowa at 768–772, 156 N.W.2d at 667–669.

In the present case, evidence of actionable representations primarily exists in the testimony of Obe and Ross regarding the statements made to them by Gahn which induced them to enter the franchise agreement and statements of Gahn and Haws which caused Ross to enter the land purchase contract. Evidence of intent to defraud exists in the showing that these representations were made in reckless disregard of whether they were true or false, if not with a positive intent to deceive.

We find all of the elements of actionable fraud are supported by substantial evidence.

II. *Haws' personal liability.* In attacking the trial court's finding of Haw's personal liability for fraud, the company and Haws assume his liability was predicated on his participation in the agreement to loan money to Obe and Ross for purchase of the development land. They argue he acted only in his representative capacity in entering that agreement. This argument misses the point.

His liability was predicated upon fraud, not upon contract. A corporate officer is individually liable for torts which he commits while acting within as well as outside the scope of his employment. *Citizen's Savings and Loan Association v. Fischer*, 67 Ill.App.2d 315, 214 N.E.2d 612 (1966); 19 Am.Jur.2d Corporations § 1384 at 780 (" * * * [H]e is individually liable for fraudulent acts of his own or in which he participates."). The fact Haws may have entered the agreement to loan Obe and Ross money in his capacity as corporate officer did not immunize him personally from liability for fraud involved in making the agreement.

The trial court did not err in holding Haws personally liable to Ross.

III. *The motion for new trial.* Two principal grounds are alleged in support of the claim by the company and Haws that the trial court abused its discretion in overruling their motion for new trial. The first is a contention the court made material mistakes of fact and law in its ruling which compelled the granting of a new trial. The second is a contention that the exemplary damages award was excessive.

The first contention is answered by the terms of rule 244, Rules of Civil Procedure. This rule provides that an aggrieved party may be granted a new trial for causes specified, which include errors of law or mistakes of fact by the trial court, "only if they materially affected his substantial rights." The trial court has wide discretion in deciding whether a new trial should be granted. *Smith v. Ullerich*, 259 Iowa 797, 145 N.W.2d 1 (1966). The most serious mistake alleged in the trial court's ruling is a finding that Haws made representations to Ross which induced Ross to purchase an interest in the Obe franchise. Ross purchased it in January 1972. He did not meet Haws until April 1972. Other mistakes alleged are either of little materiality or fairly debatable. Although we agree with the company and Haws that the trial court made a mistake of fact in finding Haws made representations to Ross before Ross purchased his interest in the franchise, we do not agree this mistake compelled the court to grant a new trial.

In overruling the motion for new trial in which the mistake was alleged, the court obviously concluded the mistake did not materially affect the substantial rights of the company or Haws. Clearly, it made no difference to the company's liability whether those representations were made by Haws or Gahn. Similarly, if the court believed Haws' personal liability was sufficiently predicated upon the evidence showing his role in later events, the mistake would not affect the court's determination of his liability.

The second contention rests on the theory the exemplary damages were excessive because they were apparently based on a wrong done by the company and Haws to the Webster City community in the stock sale rather than a wrong done to Ross. This contention is not supported by the record.

Principles applicable to review of exemplary damages awards are reviewed in *Northrup v. Miles Homes, Inc. of Iowa*, 204 N.W.2d 850, 861 (Iowa 1973). Exemplary damages are not intended to be compensatory; they are intended to punish the party against whom they are awarded and to deter others from similar wrongdoing; to be effective for this purpose, the award must be relatively large; the amount is peculiarly within the discretion of the trier of fact. Applying these principles to the award in this case, we do not believe the award is excessive. The trial court did not

abuse its discretion in overruling the motion for new trial on this ground.

We have considered all arguments advanced in support of each assignment of error and find no reversible error.

Affirmed.