Margaret DICKERSON, Administrator of the Estate of Bernard Dickerson, Deceased, and Margaret Dickerson, Appellees,

v.

Stanley YOUNG, Leslie Kirchner, and City of Braddyville, Iowa, Appellants.

No. 67657.

Supreme Court of Iowa.

March 16, 1983.

Gregory G. Barntsen of Smith, Peterson, Beckman & Willson, Council Bluffs, and Sanford A. Turner, Clarinda, for appellants.

Gordon K. Darling of Darling, Chickering & Darling, Winterset, Lennis J. Holm of Anderson, Werner & Holm, Creston, and Clifford F. Mesner of Phares, Torpin, Vanderheiden & Mesner, Central City, Neb., for appellees.

Considered by REYNOLDSON, C.J., and UHLENHOPP, LARSON, SCHULTZ, and CARTER, JJ.

UHLENHOPP, Justice.

This appeal involves legal questions which arose in an action based on trespass, conversion, and violation of civil rights.

Viewing the evidence in the light most favorable to the plaintiffs who prevailed at trial, *Andrews v. Struble,* 178 N.W.2d 391, 397 (Iowa 1970), the jury could find the facts as follows. Bernard Dickerson was a garbage hauler for forty-seven years. In 1968 he and his wife, Margaret Dickerson, bought a new, three-bedroom mobile home for about $14,000. The home was twelve feet wide and seventy feet long. In 1973 they bought an acreage in the east part of Braddyville, Iowa, a very small municipality, and moved the mobile home onto that land. Thereafter they lived at that location, and Dickerson operated his garbage hauling business from there.

Defendant Leslie Kirchner was superintendent in a nearby quarry and also mayor pro tem, council member, and marshall of Braddyville. His property adjoined the Dickerson acreage; a ravine with a line fence down the middle ran between the two properties. Kirchner kept a few hogs, and the runoff from his hog lot went into the ravine. A sewer line from the Dickerson acreage also emptied into the ravine. Not far distant was the city dump, where rats were a continual problem.

In addition to the mobile home, the Dickersons had numerous miscellaneous items of property on their acreage from time to time. At one time Dickerson was told he had to get rid of some old cars on the property, and he had the bodies of no less than forty of them crushed and hauled off. He would remove and use or sell the useful parts from cars. At the time of the events in question the Dickersons had the following property on the acreage in addition to the mobile home: a frame building twenty feet square, their son's eight-by-thirteen foot travel trailer (and its furniture), two "packer" garbage trucks formerly used in the business but presently inoperable, a number of old cars in various states of disrepair, tools, and numerous other items of personal property.

The mobile home contained three bedroom suites as well as living-room furniture, kitchen appliances, a microwave oven, a color television set, the Dickersons' clothing, family keepsakes, Margaret Dickerson's collection of over 100 salt and pepper shakers, their deceased son's Purple Heart medal, the flag from his coffin, voice tapes from him when in Viet Nam, Bibles containing the Dickersons' family records, and numerous other family items listed on several single-space pages in the record.

With considerable justification, neighbor Kirchner objected to the condition of the Dickerson acreage, and the subject was discussed in city council. Within about a year prior to the events in question—the exact dates are difficult to decipher from the record—Dickerson became ill and required treatment. He had diabetes, very poor eyesight, and difficulty passing his urine. The Dickersons packed two bags, gave directions for their mail, and left for a nearby city where they stayed with a son while Dickerson received treatment. Later Dickerson was in a nursing home for a time, and then in other temporary quarters in Creston, Iowa, to be near the place of treatment. The Dickersons intended to return home when he got better.

The poor conditions at the acreage deteriorated greatly during the Dickersons' absence. With all the cars and other items, the acreage presented an unsightly appearance to begin with, but unattended it grew much worse. Vermin and rodents inhabited the mobile home, food rotted in the refrigerator and freezers, and the place degenerated into a deplorable state.

On the evening of March 29, 1979, a tornado struck Braddyville. Severe damage occurred in the west part of the city; some secondary wind damage occurred in the east part where the Dickerson acreage lay. The Dickersons' mobile home and the other structures on the acreage were left intact, although the mobile home was turned on its concrete-block foundation somewhat and the door was loosened. Other minor damage was done to property on the acreage.

The Braddyville tornado brought numerous volunteers from surrounding areas to help with the debris, and various firms furnished heavy equipment including bulldozers.

The Dickersons, then at Creston, heard about the tornado and called the Page County Sheriff the morning of March 30, 1979. He told them their home was flattened. Their son immediately took them and friends named Jolliffes to Braddyville. After discovering that their damage was minor, they padlocked the door on the mobile home and returned to Creston, thinking their property was secure.

Although the condition of the Dickerson property was not materially different than before the tornado, the jury could reasonably find that Kirchner resolved to seize upon the occurrence of the storm to end the Dickerson acreage problem. The problem consisted not only of the structures, items, and rodents on the acreage; it also involved the sewer draining raw sewage into the ravine between the acreage and the Kirchner property. Kirchner subsequently testified about post-tornado activities, "Well, he had sewers that run down, dumping raw sewage on me. And that was going to cease."

After obtaining the city council's concurrence to a plan of "cleaning up" the Dickerson property, Kirchner advised Page County Sheriff Dick Hunt of the plan on or about March 31, 1979. The sheriff fell in with the plan and said he would arrange for persons from the county health department to inspect the property and declare it a health hazard.

Accordingly on April 3, 1979, two representatives of the county health department went to Braddyville and to the Dickerson acreage, forcibly entered the mobile home, viewed the deplorable conditions, and returned to the sheriff in the business district. The sheriff composed the following written statement:

I have inspected the Bernard Dickerson property in Braddyville, Iowa on this date. I declare that it is a health hazard and that it should be taken down and cleaned up at once. 4/3/79
[Signed:]
Joyce Hickey PHN RN
Theresa Borthwick, Page
County Health Committee

[Signed:]
73–1 Dick Hunt

At this time defendant Stanley Young was a bulldozer operator employed by a local construction firm. He assisted in the cleanup work in Braddyville. When the signed writing was obtained, Kirchner went to the Dickerson acreage and, by radio, directed Young to come there. The sheriff was also there, and made an inventory of items he thought people might be interested in. He then took charge of allowing persons to come onto the premises, of establishing a price on items of personal property based on what those persons were willing to pay, and of selling them the items accordingly. Later the sheriff paid these proceeds to the Dickersons.

Kirchner asked the sheriff two or three times at the site if he was going "to stop them from cleaning this place up." The sheriff testified:

Q. Each time you were asked that, your reply was no, you were not going to stop them; is that correct? A. That's correct.

Q. And you didn't stop them? A. No, I didn't.

The contents of the mobile home were not removed. On Kirchner's order, Young bulldozed over the mobile home and contents as well as the travel trailer and contents, drove over and flattened them, and burned them. The sheriff subsequently sold the two packer trucks for the amount offered by a buyer, and had a salvage firm crush out the cars on the premises. This destruction was all conducted without knowledge on the Dickersons' part or notice to them.

Unaware of the destruction, the Dickersons returned to Braddyville with their sons about a week later. Mrs. Dickerson, who does not appear to be given to long answers, testified:

Q. Now, as best you can recall, after March 30, 1979, when you and you son and the Jolliffes went down there, you saw your trailer in the condition it appears in that picture, about how long was

it until you went back down to Braddyville? A. About a week or two.

Q. Until you got there did you know it was destroyed? A. No, we didn't.

Q. Nobody had told you about it? A. No.

Q. Had you received any letters or papers—A. Nothing.

Q.—of a kind? A. Nothing.

Q. Did you receive anything from Page County? A. (Witness shaking head.)

Q. Did you receive anything from the Town of Braddyville? A. No.

Q. Did you receive anything from anybody else? A. No.

Q. Had you had any phone calls about it? A. No.

Q. Did your husband know before you got to Braddyville that it had been destroyed? A. No.

Q. Okay. What did it look like when you got there and saw the property? A. I couldn't say.

Q. Well, was there anything standing on the property? A. It was just a clear lot. Wasn't nothing—

Q. Was it gone when you came back a week later? A. Everything was gone.

Q. There wasn't even a pile of burned rubble there? A. Yes. That was there.

Q. Could you recognize any of it as being part of your property? A. Well, I wasn't able to get out and walk around, but the boys got out and looked, and they couldn't find nothing.

Q. How did you feel about this when you discovered it? A. I didn't have no feelings.

Q. What do you mean? A. Well, everything was gone.

Q. Did you cry? A. Yeah.

Q. Did it upset your husband? A. Yeah.

In June 1979 Kirchner and the Braddyville mayor had the debris that was left from the fire pushed into the ravine and covered over with a substantial amount of dirt from both the Dickerson and Kirchner properties. On June 14, 1979, they called the sheriff to the scene and explained what they had done. The sheriff concluded his written report of this incident with the statement, "This lot really looks nice now and there is no sign of rats like they had there before." The Dickersons were unaware of these activities also until they learned of them later.

The Dickersons commenced this damage action against various defendants including Kirchner, Young, and Braddyville. During the pendency of the proceedings Dickerson died, and his wife as the administrator of his estate was substituted as a party. After trial the jury awarded damages against the several defendants on the three grounds of trespass, conversion, and violation of civil rights. Following a hearing on a post-trial motion, the trial court entered judgment for compensatory damages as follows: for Margaret Dickerson, Administrator, $38,-187.50, and for Margaret Dickerson, individually, $50,312.50, against Young, Kirchner, Braddyville, Hunt, and Page County; and for punitive damages as follows: jointly for Margaret Dickerson, Administrator, and Margaret Dickerson individually against Young for $15,000, Kirchner for $47,500, Hunt for $44,375, and Hickey for $2000.

Later some defendants settled as to their liability, so that only Kirchner, Young, and Braddyville, whom we will call defendants, remain in the case. They appealed, and plaintiffs, whom we will call the Dickersons, cross-appealed.

■ I. Defendants' first ground of their appeal is that the court erred in submitting the issue of the Dickersons' emotional distress. Defendants initially argue that the trial court did not submit to the jury the elements of an action for emotional distress. This, however, is not that kind of action. This case is founded on trespass, conversion, and deprivation of civil rights, all intentional torts. Emotional distress is not the *gravamen* of the action; it is merely an item of *damage*. *Moyer v. Gordon*, 113 Ind. 282, 288, 14 N.E. 476, 478 (1887); *Perkins v. Ogilvie*, 148 Ky. 309, 313, 146 S.W. 735, 737 (1912); *Lambert v. Sine*, 123 Utah 145, 150, 256 P.2d 241, 244 (1953) ("The case is not

one where no actionable wrong existed except for mental pain and suffering. A cause of action exists apart from the element of pain and suffering . . . .”). We do not find merit in this ground.

■ Defendants also argue that the Dickersons did not introduce substantial evidence of emotional distress. We have examined the record under the general rule that we view the evidence in the light most favorable to the party having the burden of proof. *Andrews v. Struble,* 178 N.W.2d 391, 397 (Iowa 1970). While the express testimony of distress is not strong, the facts themselves—the Dickersons’ returning to their home site to find it flattened and burned—would inevitably have a strong impact on the emotions of a normal individual. Thus the physical facts tend to support such testimony on this subject as the record does contain. *See In re Goretska’s Estate,* 234 Iowa 1080, 1085, 13 N.W.2d 432, 434 (1944). The trial court did not err in submitting emotional distress as a damage item.

II. Defendants’ second ground of appeal is that the trial court erred in its instruction on the issue of punitive damages. The court dealt with this issue in instruction 17, which we will set out later. Defendants initially contend that the instruction, apparently from its length, gave undue emphasis to punitive damages.

■ The court faced a somewhat complicated situation regarding punitive damages. Not only did the case involve several individual defendants who had different roles in the occurrences, but the rules relating to liability for such damages under state law for trespass and conversion were not identical to those under federal civil rights legislation. The court covered the entire subject in one instruction, which necessarily made the instruction quite long. The court might have simplified the subject by dividing it into more than one instruction, but this would have invoked a claim of still more emphasis. In reading the set of instructions seriatim, we do not find that the court unduly emphasized punitive damages. *See Carradus v. Lange,* 203 N.W.2d 565, 570 (Iowa 1973).

■ Defendants next contend instruction 17 was erroneous in stating that punitive damages could be awarded even if the Dickersons sustained only nominal actual damages. Such an instruction would be correct under the federal civil rights theory of recovery, *Rogers v. Loether,* 467 F.2d 1110, 1120 (5th Cir.1972), *aff’d* 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260; *Basista v. Weir,* 340 F.2d 74, 87 (3d Cir.1965), but it would be incorrect under the state trespass and conversion theories. But punitive damages would be allowable under state law if actual damages occurred notwithstanding that they were not allowed by the jury—provided, of course, that punitive damages were otherwise allowable. *Pringle Tax Service, Inc. v. Knoblauch,* 282 N.W.2d 151, 154 (Iowa 1979).

In this case, however, the record shows as a matter of law that the Dickersons sustained actual damages—and the jury did award such damages. Although this part of the instruction misstated state law, no prejudice resulted.

■ Defendants also argue that the jury awards of punitive damages against the representatives of the public health department as defendants, without awarding actual damages against them, reflect passion and prejudice and are unsupported by substantial evidence. As those defendants settled with the Dickersons, we do not consider this argument. Based on the record we do not think this aspect of the case affected the jury’s findings as to the other defendants.

■ Finally, defendants assert that the awards of punitive damages against Young and Kirchner are the result of passion and prejudice and lack evidentiary support. The parties argue the facts at length, but we think that their discussion is more in the nature of jury argument than an argument of law. The jury could find that Kirchner had an ulterior motive in eliminating the Dickerson homestead and deserved punishment based on actual malice. The jury could also find that Young acted with reck-

less disregard of the Dickersons' rights. *See Sebastian v. Wood,* 246 Iowa 94, 66 N.W.2d 841 (1954) (punitive damages allowed for actual malice or willful or reckless disregard of rights of others).

We do not find reversible error in connection with punitive damages. Instruction 17 might have been subject to other objections, but we confine ourselves to the objections raised.

■ III. Defendants assert that the jury's verdict is excessive, lacks evidentiary support, and reflects passion and prejudice. We have examined the record with respect to the several items of damages awarded and find them to be supported by substantial evidence. *See Grefe v. Ross,* 231 N.W.2d 863 (Iowa 1975). Far from reflecting passion and prejudice, our reaction to the record and verdict is that the jury carefully considered the items of damage claimed and exercised mature judgment in the awards for and against the respective parties. Defendants' assertions may constitute influential jury argument, but again they do not provide a legal basis for our overturning the verdict.

IV. One of the grounds for recovery was deprivation of civil rights under section 1983 of title 42, United States Code (1981):

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Defendants maintain that the Dickersons must fail on this ground of recovery because they did not introduce substantial evidence that defendants acted "under color of law" and because defendants acted in good faith.

■ The federal statute applies to deprivation of property rights. *Lynch v. Household Finance Corp.,* 405 U.S. 538, 553, 92 S.Ct. 1113, 1122, 31 L.Ed.2d 424, 435, *rehearing denied,* 406 U.S. 911, 92 S.Ct. 1611, 31 L.Ed.2d 822 (1972).

■ That the jury could decide defendant Kirchner acted under color of law is clear. The jury could find he was a city official, obtained the concurrence of the city council as the governing body, and acted in his official capacity although from private motives. This meets the test of action under color of law. *Robison Wichita Falls & North Texas Community Action Corp.,* 507 F.2d 245, 250–51 (5th Cir.1975); *Dewell v. Lawson,* 489 F.2d 877, 881–82 (10th Cir. 1974); *Jennings v. Patterson,* 488 F.2d 436, 441 (5th Cir.1974); Nahmod, *Civil Rights & Civil Liberties Litigation,* § 2.04 (1979) ("For all practical purposes, according to the Supreme Court, 'color of law' and state action are the same, and mean that § 1983 regulates state and local governmental conduct, as distinct from purely private conduct."). His involvement in the destruction as a city official, plus the concurrence of the council, also implicate Braddyville under *Monell v. New York City Department of Social Services,* 436 U.S. 658, 695, 98 S.Ct. 2018, 2038, 56 L.Ed.2d 611, 638 (1978).

■ The situation with Young is not as plain but it presents a jury issue on the requirement of action under color of law. If Young acted as a private person he would not be liable under the civil rights ground of recovery; if however the jury found he combined and worked with a public official—Kirchner—the federal statute would apply. *Baldwin v. Morgan,* 251 F.2d 780, 786 (5th Cir.1958); *see* Nahmod, § 2.04, at 39. The jury was within the evidence in resolving this issue against Young.

■ The defense of good faith is not available to Braddyville. *Owen v. City of Independence,* 445 U.S. 622, 639, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673, 686, *rehearing denied,* 446 U.S. 993, 100 S.Ct. 2979, 64 L.Ed.2d 850 (1980). Assuming arguendo that good faith was a defense to defendants Kirchner and Young, the evidence presented a jury question as to their bona fides. The trial court submitted this issue to the

jury, which found against those defendants. No reversible error appears at this point.

V. Because one ground of recovery was deprivation of civil rights, the Dickersons asked for attorney fees under section 1988 of title 42, United States Code (1981):

> [I]n any action or proceeding to enforce a provision of [section 1983] ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

The Dickersons asked $71,918 for legal services based on approximately 1025 hours of legal work at $70 per hour, plus $4,389 for expenses. The trial court allowed $50,000 for services and $4,389 for expenses. Defendants argue that the amounts allowed are excessive. In their cross appeal the Dickersons claim that the trial court should have allowed the full amount asked.

 One factor—and it is only a *factor*—to consider in fixing the fees is the amount of time necessarily spent, at a reasonable dollar rate for that time. *Foster v. Gloucester County Board of Chosen Freeholders,* 465 F.Supp. 293, 298–99 (D.N.J. 1978). The ultimate test is the overall worth of the attorney's services in handling the particular litigation. This involves, in addition to the time and work involved, the novelty and difficulty of the questions presented, expertise required, preclusion of other available employment, customary fee for such a case, fixed or contingent nature of the fee, time limitation imposed, amount involved, result obtained, experience and ability of the attorney, unpopularity of the case, nature and length of attorney-client relationship, and fee awards in similar actions. *Gunther v. Iowa State Men's Reformatory,* 466 F.Supp. 367, 368 (N.D.Iowa 1979); *Alsager v. District Court of Polk County,* 447 F.Supp. 572, 577–78 (S.D.Iowa 1977). *See also Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974).

 The crux of the fee issue in this case is the duplicative services by the three attorneys for the Dickersons. Duplication of effort and proper utilization of time should be scrutinized; consideration may be given to the actual use of two or three attorneys for investigation, discovery, pretrial hearings, motions and pleadings, and other facets, when one attorney would do. *Dunten v. Kibler,* 518 F.Supp. 1146, 1151 (N.D.Ga.1981). Attorneys should consider what they would do in this respect if their client had to pay the fee out of his own pocket. *See Johnson,* 488 F.2d at 717 ("If more than one attorney is involved, the possibility of duplication of effort along with the proper utilization of time should be scrutinized. The time of two or three lawyers in a courtroom or conference when one would do, may obviously be discounted."); *Alsager,* 447 F.Supp. at 578 (three attorneys—described as "totally unnecessary and unavoidably resulted in an overlap of research and time"). In addition, the hourly rate at which two of the three lawyers in this case valued their time was too high; we do not believe they would bill a privately-paying client at that figure.

 Upon close examination of the proceedings which occurred in this case and the factors we have listed for evaluating legal services including the itemized statements of the attorneys, we hold that the trial court made an appropriate adjustment for duplicative services of the attorneys and excessive rates for two of them, and that the court properly allowed $50,000 plus expenses.

The parties have not argued an apportionment of fees between the federal civil rights claim and the pendent state claims, and we do not consider that question. *Compare Barrett v. Kalinowski,* 458 F.Supp. 689, 704 (M.D.Pa.1978), and *Carmel v. Borough of Hillsdale,* 178 N.J.Super. 185, 190, 428 A.2d 548, 550–51 (1981), *with Milwe v. Cavuoto,* 653 F.2d 80, 84 (2nd Cir.1981), *Church of Scientology v. Cazares,* 638 F.2d 1272, 1290–91 (5th Cir.1981), and *Anderson v. Redman,* 474 F.Supp. 511, 515–16 (D.Del. 1979).

VI. Defendants argue that the claimed errors which we have addressed in the preceding divisions collectively resulted in a

verdict which does not effectuate substantial justice. Since we have not found reversible errors in those divisions, this argument fails.

VII. On their cross appeal the Dickersons first claim that the trial court erred in not allowing them the punitive damages from Braddyville which the jury found. The record in this connection is unusual.

In their petition the Dickersons asked for judgment against all defendants "jointly and severally" for compensatory damages in a specified amount—and also for punitive damages in the amount of $1,200,000. In their requested instructions the Dickersons asked the trial court to submit the case to the jury on special verdicts allowing an amount for compensatory damages and an amount for punitive damages. They submitted several sets of special verdicts against or for the several defendants in various combinations, depending on the jury's findings.

In its jury instructions, however, the trial court submitted the compensatory damage findings and the punitive damage findings differently. It had the jury answer separate interrogatories as to the amount of compensatory damages of Margaret Dickerson, Administrator ($38,187.50 awarded), and Margaret Dickerson individually ($50,312.50 awarded). These findings are unambiguous and presented no problem in entering judgment.

As to punitive damages, the court gave the jury the following instruction 17:

The Plaintiffs have asked to recover over and above their actual damages what is known in the law as punitive damages. Punitive damages may, in appropriate circumstances, be awarded either pursuant to the Federal Civil Rights claim of the Plaintiffs or the Claim the Plaintiffs assert under state law. You may award punitive damages if you find that the actions of a Defendant or Defendants were done either with actual malice or with a wanton or willful disregard of the rights of the Plaintiffs.

In this regard, the type of malice the law speaks of is "legal malice". Thus, to constitute malice, it is not necessary that there should be hatred or ill will, or malice in that sense. The showing of wantonness or willful disregard of the rights of others may constitute legal malice. A willful and malicious act is one done in such a manner and under such circumstances as to show heedlessness and utter disregard and abandonment as to what result may flow from a doing of an act or from the manner in which it is done.

If the jury should find from a preponderance of the evidence in the case that the actions of one or more of the Defendants was done maliciously, or wantonly, or oppressively then, you the jury may, in the exercise of your discretion, return an award of punitive damages, in an amount you agree to be proper.

If the jury should so find that the individual Defendants acting as agents and officers of the City of Braddyville, Iowa and Page County, Iowa, implemented their official policies and performed their duties in a malicious, wanton or oppressive manner, then you may return an award of punitive damages against the City of Braddyville or Page County in an amount you agree to be proper.

An act or failure to act is "maliciously" done if prompted or accompanied by ill will, or spite, or grudge, either toward the injured person or persons individually, or toward all persons in one or more groups or categories of which the injured person is a member.

An act or failure to act is "wantonly" done if done with actual knowledge that the action is a violation of rights secured by the Constitution and laws of the United States, or done in reckless disregard of the rights of one or more persons including the injured person.

An act or failure to act is "oppressively" done, if done in a way or manner which injures, or damages, or otherwise violates the rights of another person with

unnecessary harshness or severity, as by misuse or abuse of authority or power, or by taking advantage of some weakness, or disability, or misfortune of another person.

*Punitive damages if assessed are to be assessed against each Defendant individually.* That is each Defendant would be punished separately—in an amount you consider sufficient to punish them in light of that particular Defendant's conduct—and that particular Defendant's financial resources. Punitive damages are allowed on the basis of punishment of the wrongdoer, not so much upon the nature and extent of the injury.

Whether or not to make any award of punitive and exemplary damages is a matter exclusively within the province of the jury, if the jury should unanimously find, from a preponderance of the evidence in the case, that the Defendants' act or omission, was maliciously *or* wantonly *or* oppressively done. The jury should bear in mind that the Plaintiffs need only show one of the prohibited types of behavior to be entitled to an award of punitive damages.

Furthermore, if you the jury, find by a preponderance of the credible evidence that the conduct of one or more of the Defendants was malicious, or wanton, or oppressive, you may award punitive damages against that Defendant in favor of one or both Plaintiffs, even though you do not award one or both Plaintiffs actual or compensatory damages for personal injuries.

In other words, even though you find that one or the other of the Plaintiffs suffered no actual personal injury at the hands of the Defendants, nonetheless, you can award punitive damages. Also, an award by the jury of punitive damages can be based upon a jury finding of nominal damages. Nominal damages are a trifling sum awarded to a Plaintiff in an action, where there is no substantial loss or injury to be compensated, but still

the law recognizes a technical invasion of his rights or a breach of the Defendant's duty, or in cases where, although there has been a real injury, the Plaintiff's evidence entirely fails to show its amount.

(Emphasis added.)

The court submitted the following interrogatory No. 6 which the jury answered as shown:

We, the Jury, find that the plaintiffs are entitled to recover punitive damages against the following defendants in the following amounts, if any:

(If none, so indicate.)

| | |
|---|---:|
| Stanley Young | $ 15,000.00 |
| Leslie Kirchner | $ 47,500.00 |
| City of Braddyville, Iowa | $ 96,875.00 |
| Richard N. Hunt | $ 44,375.00 |
| Joyce Hickey | $ 2,000.00 |
| Theresa Borthwick | $ 2,000.00 |
| Page County, Iowa | $112,000.00 |

On a post-trial motion, the court set aside the awards of punitive damages against Braddyville and Page County on three grounds: those awards were improper under the civil rights statute, *Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616, 635 (1981); the awards against the individual defendants and their respective governmental units were duplicative; and the awards when aggregated were excessive. The Dickersons have since settled with Page County and some other defendants, but they ask that we reinstate the award against Braddyville. This request involves the three bases on which the trial court grounded its deletion of the awards against Braddyville (and county).

█ As to the trial court's first ground, *Fact Concerts* renders Braddyville (and the county) immune from liability under the federal statute for punitive damages. This however should not bar the Dickersons from recovering such damages under the two state-law theories which the jury found were established. The Dickersons did in fact recover compensatory damages; in ad-

dition, on punitive damages the court instructed on the requirement of actual or legal malice and, as we have found, the evidence of malice was sufficient. We hold that the Dickersons are not disentitled to punitive damages on the basis of *Fact Concerts*. We do not read that decision as preventing an award of punitive damages on an independent state ground which is joined with a claim under section 1983.

■ The trial court's second ground relates to duplication of awards. Defendants rely on *Team Central, Inc. v. Teamco, Inc.,* 271 N.W.2d 914 (Iowa 1978). That case, however, does not involve the unusual procedural situation we have here. In its instructions here the trial court submitted single findings against all defendants as to compensatory damages to each of the two plaintiffs. As to punitive damages, however, the jury was told that a defendant's wealth could be considered on the amount, and the court directed individual findings as to each defendant. For reasons of their own, the defendants did not object to this individual manner of submission—although they objected, of course, to submission of punitive damages at all.

We do not decide at this time whether this is an appropriate manner of submitting punitive damages in cases involving more than one defendant. The defendants went along with it. Our problem is to interpret the manner of submission and to apply the interpretation to the judgment.

The most reasonable interpretation of the manner of submission appears to be this. The jury found that the total compensatory damages to which the Dickersons were entitled were $38,187.50 (Margaret Dickerson, Administrator) and $50,312.50 (Margaret Dickerson individually). These amounts were imposed *jointly* against the defendants found liable; the relative wealth or lack of wealth of the respective defendants was not a factor to consider. But the jury then decided in substance that the two plaintiffs together were also entitled to pu-

nitive damages of $320,250. The jury imposed the punitive damage award among defendants *severally,* however, in the sums stated in their answer to interrogatory 6; instruction 17 stated, "Punitive damages if assessed are to be assessed against each Defendant individually." The amount of $96,875 assigned to Braddyville is not duplicative of the amounts of $15,000 and $47,500 assigned to Young and Kirchner respectively; it is rather the portion which the jury assigned to Braddyville of the whole punitive damage award. Under the instructions it is the amount of smart money the jury found Braddyville should pay for the wrongs to the Dickersons. We do not find duplicative awards as in *Team Central.*

■ As to the third ground—excessiveness—the total award of $320,250 in punitive damages is large indeed and approaches the outer limits. But upon consideration of the various factors relating to the amount of punitive damages, *Hall v. Montgomery Ward & Co.,* 252 N.W.2d 421, 425 (Iowa 1977), we hold that the total award and the individual award against Braddyville are not excessive.

■ We consider finally two other issues on this branch of the case. Defendants argue that Young was not a servant or agent of Braddyville and could not render Braddyville vicariously liable for punitive damages under the two state-law bases of recovery. This point is really immaterial, as the force behind the destruction of the Dickerson property was Kirchner, and he was a standing official of Braddyville and acted with council knowledge and concurrence. Apart from Young, Kirchner's conduct would render Braddyville liable.

Moreover, the council could hardly have expected Kirchner to raze the Dickerson property personally; he had to have machinery and help. *See Restatement (Second of Agency* § 80(c) (1957)). He did exactly as he was expected to do, and obtained machinery as well as help to operate it in the person of Stanley Young. The conduct

of Young also thus bound Braddyville. We do not find merit in defendants' argument.

■ An argument is also advanced that the jury may have found malice against Braddyville on only the civil rights basis of recovery. In answer to interrogatories the jury expressly found that defendants were liable on all three theories: trespass, conversion, and section 1983. The issue of damages, including punitive damages, was submitted to the jury separately from liability. Punitive damages were dependent on malicious, wanton, or oppressive conduct. The identical evidence on maliciousness, wantonness, and oppressiveness was introduced under all three theories of liability. Moreover, the council's knowledge and concurrence in the wrongful acts were just as material to establish *respondeat superior* under the state theories as they were to satisfy *Monell* under section 1983. On the facts, if the jury found punitive damages at all it would necessarily find them on all three grounds of liability, or it would not find punitive damages. Since the jury awarded punitive damages against Braddyville, and since it found Braddyville liable for trespass and conversion, the punitive damage award must stand under those two bases of liability although it cannot be allowed on the basis of section 1983. The trial court should have awarded judgment in favor of the Dickersons jointly, and against Braddyville, in the additional sum of $96,875 as punitive damages. We note that the matter of punitive damages against municipalities under chapter 613A of the Iowa Code is now governed by chapter 1018 of the Acts of the 69th General Assembly (1982).

■ VIII. The Dickersons also claim that the trial court should have granted them interest on the recovery from the date the action was commenced rather than from the date of the judgment. They are correct. *Coachman Industries, Inc. v. Security Trust & Savings Bank,* 329 N.W.2d 648, 651 (Iowa 1983); *Jande v. Iowa Indus-* trial *Hydraulics, Inc.,* 326 N.W.2d 339, 344–45 (Iowa 1982). The judgment must be amended accordingly.

In this appeal the parties have not argued the settlement which some of them entered into, and we have given no consideration to it.

We return the case to district court for an amendment to the judgment (1) awarding judgment in favor of the Dickersons jointly and against Braddyville in the additional sum of $96,875 as punitive damages and (2) starting interest to run on the judgment on the date of commencement of the action.

Costs in this appeal are assessed to appellants.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

All Justices concur except SCHULTZ, J., who dissents in part.

SCHULTZ, Justice (dissenting).

I cannot endorse division VII of the majority opinion. I would not reinstate the award of punitive damages in favor of the Dickersons against Braddyville. Otherwise, I concur.

The award of punitive damages against a municipality is wrong. Although legislation has been enacted recently which exempts the city from any liability for punitive damages, 1982 Iowa Acts ch. 1018 § 5, I would overrule our decision in *Young v. City of Des Moines,* 262 N.W.2d 612 (1978), and exempt municipalities which would otherwise be liable for punitive damages.

Although municipalities should not be subject to punitive damages awards, such awards must still be permissible in actions against other tortfeasors. The imposition of money sanctions is often a significant punishment and a powerful deterrent. When a municipality is punished for the wrongful acts of its employees, however, it is the taxpayers, who must pay for the tort either in increased taxes or in reduced mu-

nicipal services, who are punished. Among the taxpayers punished we would find non-resident property owners who have no direct voice in municipal affairs. Since the plaintiff is already fully compensated he is receiving a windfall at the expense of the taxpayers; this result is unjust. Recently, the Supreme Court recognized this injustice. In *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), the Court stated:

> [A]n award of punitive damages against a municipality "punishes" only the taxpayers, who took no part in the commission of the tort. These damages are assessed over and above the amount necessary to compensate the injured party .... Indeed, punitive damages imposed on a municipality are in effect a windfall to a fully compensated plaintiff, and are likely accompanied by an increase in taxes or a reduction of public services for the citizens footing the bill. Neither reason nor justice suggests that such retribution should be visited upon the shoulders of blameless or unknowing taxpayers.

*City of Newport*, 453 U.S. at 267, 101 S.Ct. at 2759–60, 69 L.Ed.2d at 632. For the above reasons I would change our rule and would exempt municipalities from liability for punitive damages.

The availability of punitive damages serves as a message to those who contemplate deliberate or malicious wrongs. A large award of punitive damages reminds us of the problems that such an award can present. I have discussed those problems that I believe this court can remedy. There is another problem, however, that could be addressed by the legislature. A plaintiff who receives punitive damages is often fully compensated and the punitive damages award is often a windfall. Perhaps, to avoid this enrichment, we should treat punitive damages as we treat fines assessed in criminal actions. It would seem more equitable for the public, rather than the fully compensated individual, to receive some or all of the award. Of course, some provision must be made to preserve the plaintiff's incentive, such as reimbursement of attorney fees, or an award to the plaintiff in the nature of a finders fee.