CADY, Chief Justice
(concurring specially).
I concur in the opinion of the majority. I write separately to clarify my reason for joining the holding by the majority to allow the claim to go forward and to emphasize the inherent difficulties and challenges presented by opening the courthouse doors to paternity fraud.
While claims for fraud have been applied to many types of relationships of trust and confidence, such as attorney and client, employer and employee, and accountant and investor, the relationship involved in a claim of paternity fraud is distinguishable by the inherent presence of uncertainty caused by conversations or assurances of paternity. See Wilson v. Vanden Berg, 687 N.W.2d 575, 577 (Iowa 2004) (resolving fraudulent misrepresentation appeal between an attorney and his clients); Lloyd v. Drake Univ., 686 N.W.2d 225, 238 (Iowa 2004) (resolving fraudulent misrepresentation appeal between employer and employee); Eldred v. McGladrey, Hendrickson & Pullen, 468 N.W.2d 218, 220 (Iowa 1991) (recognizing validity of claim for fraudulent misrepresentation between investors and accounting firm that performed an audit, but finding insufficient evidence of reliance). All personal interaction- exists in a kaleidoscope of reasoning affected by an ever-changing landscape of complex motivations and emotions. But, relationships marked by sexual intimacy can be the most complex, sometimes so complex that the conduct they produce can defy common reasoning found in the outside world. Consequently, a mother, or an expectant mother, may choose to tell a man that he is the father of her child for many reasons that are unrelated to mere financial gain. A man may also choose to form a bond with a child regardless of whether the child is biologically his own, and as in this case, a putative father may feel wrongly persuaded into forming a supportive bond with the child and may be entitled to recover for the misrepresentation. In the end, it becomes painfully obvious that parties pushed into the justice system over a paternity fraud claim could never leave it unscathed, and the standards of justice will certainly be stretched to their limits, even if justice is attainable. This consequence may cause many reasonable, caring people to simply leave the claim dormant for the betterment of others. For sure, these circumstances have caused some courts to carve an exception for fraud in the context of paternity by condemning the putative father’s initiative to recover. Yet, our precedent has not been for courts to decide whether it is prudent social policy to limit a common law cause of action for fraud simply because the facts present a difficult or complicated issue within the realm of otherwise normal legal framework. See Rosen v. Bd. of Med. Exam’rs, 539 N.W.2d 345, 349 (Iowa 1995) (recognizing “[f]raud is a generic term whose precise contours are often left undefined for the very purpose of giving tribunals the liberty to deal with it in whatever form it may present itself’). Nor is it our role to apportion blame between parties for any tension or turmoil between the child and the parents, particularly when these matters arise out of both parties’ uniquely complex motivations. Instead, our role is simply to determine whether the plaintiff has established a cause of action according to our rules of notice pleading. This approach, of course, does not mean we should ignore the reality that certain types of fraud cases carry collateral conse *16 quences that are sometimes difficult to swallow.
While the misleading conduct of a mother, or any person, should be discouraged, the conduct of a man voluntarily forming a bond with and supporting a nonbiological child in a nontraditional family setting is, on the other hand, arguably a noble cause to encourage in our society. See Melony B. Jacobs, When Daddy Doesn’t Want to be Daddy Anymore: An Argument Against Paternity Fraud Claims, 16 Yale J.L. & Feminism 193, 195-98 (2004) (noting the disconnected logic that seems contrary to efforts to make decisions in accordance with the best interests of the child when our courts recognize two fundamentally different family law models, one that “embrace[s] functionality in the context of establishing paternal relationships” and the other that “placets] emphasis on biology in disestablishing parental relationships”). As the Nebraska Supreme Court recognized, a claim seeking to recover for support given to a child may send the message, “I wish you had never been born” to a child who was otherwise under the impression she had a father who loved her. Day v. Heller, 264 Neb. 934, 653 N.W.2d 475, 479 (2002). However, our courtroom doors are open to complex cases involving children and their parents, such as divorce and custody disputes, termination of parental rights, disestablishment of paternity, and interspousal litigation. The proceedings that ultimately unfold in a courtroom are not easy or pleasant for anyone involved, but the court is nevertheless necessary to provide a forum for addressing an alleged wrong that has already occurred within a family unit.
Thus, due to the multidimensional nature of relationships that produce children, and the many varying factors that motivate or incentivize parties involved in the child’s life, the legislature is the proper authority to balance the competing policy interests at stake and ultimately articulate the parameters of any exception to common law fraud based on public policy. Our refusal to create an exception to this case is not an expression of an opinion that the competing policy reasons are not valid. Instead, as a court, we simply continue to adhere to our broader policy, woven into the law long ago, of recognizing a remedy for fraud.
Finally, as pointed out by the majority, “[p]roving fraud is a difficult task.” In re Marriage of Cutler, 588 N.W.2d 425, 430 (Iowa 1999). Thus, Dier, and any other future litigant, faces a challenging burden to establish the essential elements of fraud and, most importantly, a measure of damages consistent with the burden on plaintiffs in other types of fraud cases. Yet, paternity fraud likely presents even greater challenges, making it even more difficult to establish. The tort necessarily involves an understanding of not only what the mother knew at the time of the representation but also what she was capable of knowing in light of the biological complexities of the female reproductive system and highly individualized biological permutations between couples that can affect fertility. See Beeck v. Aquaslide ‘n’ Dive Corp., 350 N.W.2d 149, 155 (Iowa 1984) (“ ‘A false statement innocently but mistakenly made will not establish intent to defraud....’”) (quoting Grefe v. Ross, 231 N.W.2d 863, 867 (Iowa 1975)); see Garren v. First Realty, Ltd., 481 N.W.2d 335, 338 (Iowa 1992) (finding the defendant “could have been more careful in making further inquiry is insufficient to prove she acted in reckless disregard for the truth”). The scientific component of establishing knowledge and intent will likely narrow the types of plaintiffs able to succeed on the merits to those that have facts consistent with the spirit and purpose of the cause of action.
*17 Additionally, the fact finder is responsible for ensuring that only facts directly relevant to the elements of fraud are considered in establishing the necessary proof in such particularly delicate and sensitive emotional fraud cases. Of course, as in other areas of the law, the discovery of this information will not' come without a price. In this case, much time may need to be spent uncovering details from Peters regarding her knowledge of the paternity of the child that may involve her disclosing details of her sexual history that are intimate and perhaps at times embarrassing to her. But, let the buyer beware, too. Investigating the element of justifiable reliance will likely dig deeply into the relationship, revealing potentially unattractive details about the conduct and personalities of both parties.
Although these consequences might seem inequitable at times, relevant evidence can often be embarrassing to parties and witnesses in other types of cases. We do not foreclose a cause of action because some information relevant to the truth-seeking process may be uncomfortable to disclose. State v. Baker, 679 N.W.2d 7, 11 (Iowa 2004). Fact finders are entrusted with the important task of weighing the value that each fact contributes in proving the elements of fraud. This is a process we trust time and time again and a process I am confident will continue to strike the appropriate balance between the competing interests involved in disclosing such sensitive information. At the same time, the process may be one made better by its infrequent use.